United States Court of Appeals,

Fifth Circuit.

No. 95-60203.

ASARCO, INC., Petitioner-Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.

July 10, 1996.

Petition for Review & Cross-Petition for Enforcement of an Order of the National Labor Relations Board.

Before REYNALDO G. GARZA, WIENER and STEWART Circuit Judges.

STEWART, Circuit Judge:

This case involves a petition for review of and a cross-application for enforcement of an order of the National Labor Relations Board regarding the dismissal and subsequent treatment of a labor union president. Asarco Incorporated seeks review of the ruling of the National Labor Relations Board, which found that Asarco violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act by discharging Jerry Halford. The Board also found that Asarco violated sections 8(a)(1) and 8(a)(5) of the Act by refusing to provide witnesses' names and telephone numbers as requested by the Union to process Halford's grievance and by refusing to deal with Halford as the Union's representative after his discharge. We grant review of the Board's rulings. Our review of the record has revealed insufficient evidence to support all of the Board's decisions. Accordingly, enforcement of the Board's order is denied in part, modified, and as modified is granted in part.

1

FACTS

Asarco operates a copper refinery in Amarillo, Texas. Most of the 590 employees belong to a collective bargaining unit, which has been the predominant certified bargaining representative since May 1976. Unions are active at several other Asarco plants in the country. The company has shared a peaceful relationship with the various unions and has no history of violating the National Labor Relations Act ("NLRA").

Jerry Halford, the president of United Steelworkers of America, Local 5613 since 1985 ("the Union"), was employed as a chargeman[1] in the refined casting area at the Amarillo refinery. Halford's duties as president established him as the chief representative of the Union in dealing with management. Before serving as president, Halford was the grievance representative of the Material Handling Department for 1977 and 1978. He also served as the chairman of the grievance committee from 1980 to 1984. As chair of the union's grievance committee, Halford processed 1500 grievances and 300 workers' compensation claims. Halford continued participating in the grievance process after he became president. About 130 grievances awaited arbitration in 1993.

On May 11, 1993, Halford met with Dave Woodbury, Asarco's vice president of human resources, to complain about the backlog of grievances. Halford blamed the backlog on Mike Owsley, a new

---

[1]Halford's primary responsibility in the refinery was to ensure that the shaft furnace (which melts down copper cathodes, bars and coils for processing into cast rods) was properly charged or fueled at all times.

Asarco supervisor. Halford arranged to send Woodbury information regarding the problem; however, Woodbury did not guarantee changes. Though Stu Bryant, an Asarco manager, was present during the conversation and possibly overheard Halford's complaints, Owsley was not aware of Halford's complaint to Woodbury.

The very next day, during a down time in the refinery, Halford threw a clear plastic sandwich bag filled with about four ounces of water from his charge floor. The bag hit Mike Sanchez on the head, knocking off his hard hat and face mask. Supervisor Gene Thompson, who witnessed Sanchez walking in a "dazed" manner, sent Sanchez to the nurse's office where he was treated for minor head and neck pain.

For at least twenty years, horseplay was commonplace in the plant, and employees were not disciplined for incidents of horseplay. Some of these pranks involved throwing objects down on other employees; others even involved throwing water bags from the charge floor, as Halford had done. Horseplay went undisciplined even though a previous union grievance representative, Lowell Farmer, asked several supervisors to take corrective action regarding the horseplay before someone got hurt.[2]

When questioned about the horseplay at issue in this case, Halford admitted that he threw the object which struck Sanchez. However, he described the incident as an "accident." Halford

---

[2]Halford testified that the company has a rule regarding horseplay; however, the record does not reflect the specifics of the rule or when Asarco issued it. Halford did testify, however, that two written warnings recently have been issued regarding horseplay incidents involving knives.

3

claimed he was attempting to toss the bag into the trash dumpster below the charge floor but missed and mistakenly hit Sanchez. Stu Bryant suspended Halford for a safety violation and suspected horseplay pending further investigation.

The investigation, conducted by supervisors Bill McLean and Stu Bryant, revealed other objects that Halford had thrown from the charge floor. Don Warren explained that he had seen Halford hit Frank Leal with a water bag a month before the Sanchez incident. Rachel San Miguel said that Halford had hit her with a one inch stone that left a mark on her neck and shoulder. Further, employees Wayland, Huddleston, and Leal, indicated that Halford had thrown objects in the past.

The investigation findings were reported to unit manager Mike Owsley. Halford asked Owsley to conduct an independent investigation before making a decision because Halford believed that Owsley could be more objective than the other managers. On May 18, Owsley interviewed the employees again. Their stories corroborated the information given previously. Additionally, Owsley visited the charge floor and casting floor. Owsley concluded that Halford's story was not possible.

Owsley also reviewed a summary of Halford's disciplinary record, which revealed that several previous disciplinary actions had been taken against Halford. In fact, just two months before the water bag incident Halford was suspended for two days for dereliction of duty and unsatisfactory work performance because he was not keeping the furnace full. Though charges were filed with

4

the NLRB for some of the disciplinary actions, Owsley was unaware of this fact when making his decision regarding the water bag incident.

After reviewing the water bag incident and Halford's disciplinary record, he decided to discharge Halford and instructed McLean to draft a discharge letter. Despite his decision, Owsley allowed Halford to relate to him Halford's side of the story. On May 20, Halford described to Owsley the same "accident" story. Owsley asked had Halford done anything similar in the past; Halford replied that he had not. After the meeting, Owsley notified Halford by letter of his decision to discharge him effective May 13. The letter based Halford's discharge on several violations of Asarco's rules:

> The bases for your termination include violation of both Plant Safety Rules and General Rules of Conduct related to unsafe acts, dishonesty and unsatisfactory work performance. Each of these offenses is a separate and distinct basis for your termination.

After the May 20 termination, Asarco officials altered their treatment of Halford because he was no longer an employee of the company. For example, Asarco informed Halford that he was not permitted in the plant because he was not an employee. Consequently, a previously scheduled meeting took place without Halford on May 27. Halford also was barred from attending an Occupational Safety and Health Act ("OSHA") inspection on June 14.

The Union immediately reacted to Halford's suspension. On June 2, 1993, the Union filed an unfair labor practice charge with the NLRB, alleging violations of sections 8(a)(1), (3), and (4) of

5

the NLRA. On June 18, 1993, the Union amended its charge to allege a violation of section 8(a)(5).

On July 9, 1993, the Regional Director for the 16th Region filed a complaint with the NLRB based on the Union's charge and amended charge. Additionally, the complaint alleged that on May 25, 1993, the Union requested by letter that the Company furnish the names and telephone numbers of all witnesses who would be involved in the grievance filed on behalf of Halford and that Asarco has failed and refused to furnish the information. Further, the complaint alleged that Asarco has failed and refused to bargain with Jerry Halford, the Union's agent. Asarco answered the charge admitting in part and denying in part the allegations.

After a three day hearing, the administrative law judge ("ALJ") issued his decision and recommended order. The ALJ found that Asarco violated sections 8(a)(1) and (3) by discharging Halford, that it had violated section 8(a)(5) by refusing to bargain with the Union's agent, Halford, and that Asarco violated section 8(a)(5) by failing and refusing to provide the Union with the requested information. The ALJ further found that Asarco did not violate section 8(a)(4).

Asarco filed an exception to the ALJ's findings. However, a divided three member panel of the NLRB filed a Decision and Order (reported at 316 N.L.R.B. No. 111) adopting the ALJ's recommendations. The dissenting panel member noted that he would not have found that it was proven by a preponderance of the evidence that Halford was discharged for unlawful reasons. The

NLRB ordered Asarco to offer Halford immediate and full reinstatement to his former job or an equivalent one and to provide Halford with back pay. Asarco now petitions the Fifth Circuit for review of this order, and the Board cross-petitions for enforcement of its order.

DISCUSSION

A. *STANDARD OF REVIEW.*

This Court's review of the NLRB's decision is more than a mere rubber stamp of the decision; however, a certain degree of deference is accorded. *See Huck Mfg. Co. v. NLRB,* 693 F.2d 1176, 1181 (5th Cir.1982). The NLRB's factual findings are reviewed under a substantial evidence standard. *Id.* The court will sustain the NLRB's decision if it is supported by substantial evidence in the record. Under the substantial evidence standard, "the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion." *Id.* Substantial evidence is determined by evaluating the entire record. *See NLRB v. Brookshire Grocery,* 837 F.2d 1336, 1340 (5th Cir.1988). Reviewing the whole record we are obligated to consider evidence that detracts from the Board's finding. *Id.* When credibility issues arise, however, we are "bound by the credibility choices of [the] ALJ," unless one of the following factors exists: (1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice. *NLRB v. Motorola, Inc.,* 991 F.2d

7

278, 282 (5th Cir.1993).

As to questions of law, we review the decision *de novo;* however, if the NLRB has given a "reasonably defensible" construction of a statute, we will affirm the decision. *See Standard Fittings Co. v. NLRB,* 845 F.2d 1311, 1314 (5th Cir.1988). It is within this framework that we review the present record and determine whether Halford has proven by a preponderance of the evidence that Asarco discharged him for unlawful reasons and whether Asarco violated the Act by refusing to provide the requested documents and to bargain with Halford.

B. *SECTIONS 8(a)(1) AND (3) VIOLATION.*[3]

Asarco contends that the Board failed to meet its burden. First, Asarco argues that the NLRB had to prove that union animus was a motivating factor in its decision to discharge Halford. Asarco has a long record of peaceful union relations and no history of having violated the Act. Further, the record is completely void of evidence of disparate treatment or union animus.

Second, even if union animus was proven, Asarco argues that

---

[3]The United States Code delineates unfair labor practices by an employer as follows:

> It shall be an unfair labor practice for an employer—
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157];
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...

29 U.S.C. § 158(a)(1), (3).

8

the burden still is not satisfied because the Board has not proven causation. Halford was not similarly situated in "all respects" with employees who were treated more leniently than he: (1) his conduct constituted aggravated horseplay because it caused injury and threatened a lethal explosion, (2) he had been dishonest, and (3) his work performance was unsatisfactory. Further, Asarco contends that the "but for" causation test fails because Asarco consistently discharged employees for safety rules violations, for giving false information to management, and for unsatisfactory work performance. Moreover, there is no proof that Asarco intended the alleged disparate treatment.

Third, Asarco maintains that it produced enough evidence to prove that it had sufficient cause to discharge Halford notwithstanding his protected union activities. Asarco has had in place rules proscribing violations for safety regulations, falsification of information, and unsatisfactory work performance.

On the other hand, the NLRB argues that the Board's findings are supported by substantial evidence. The findings are supported by the aggregate of Halford's union activity, the timing of the suspension, Asarco's departure from past practice in discharging Halford, and Asarco's treatment of Halford after the discharge. The NLRB claims that the labor relations atmosphere was less than cordial because of the large number of grievances Halford had filed. To further irritate the relationship, Halford had complained the day before the water bag incident about Owsley's failure to work with the Union. Moreover, the NLRB stressed that

9

Asarco's tolerance of horseplay in the refinery was common knowledge.

Further, the NLRB discredits the reasons advanced by Asarco as justification for its discharge of Halford for this particular prank. First, the contention that previous horseplay did not involve dangerous conduct is meritless. The NLRB presented examples of more dangerous pranks, one of which was executed by a supervisor. Second, the contention that discharge was necessary because the prank injured Sanchez also fails. Sanchez was slightly dazed; however, he went to the nurse's office only after Supervisor Thompson ordered him to go. Sanchez walked a quarter mile to and from the nurse's office and then completed his shift after visiting the nurse. Third, there is no evidence that the company relied on the apparent discrepancies in Halford's story when making its discharge decision. Fourth, the contention that Halford's discharge is comparable to previous discharges is false. Asarco has discharged employees for safety violations that led to property damage, for failing to comply with OSHA standards, and for coming to work drunk. Asarco has never discharged an employee for mere horseplay. Additionally, the contention that Owsley was a new manager with no knowledge of the history of horseplay is equally meritless because Owsley relied on reports from other, experienced management personnel when making his decision.

The ALJ found that Halford engaged in conduct that justified discipline and even discharge. In assessing credibility, the ALJ expressly found that Halford's story was physically impossible and,

accordingly, was untrue. "Falsification of information, horseplay, dereliction of duty, ... unauthorized absence from duty area, and disobeying safety regulations, or creating or contributing to any unsafe condition are all among the list of reasons stated in the [Asarco] rules as warranting discharge." Nonetheless, the ALJ found that the general counsel established a disparate treatment case. Although he produced no direct evidence of union animus, the ALJ inferred the motive from the totality of the circumstances. Further, the ALJ found that Owsley did not make the discharge decision alone; he acted upon the input of others.

We must determine whether the record contains sufficient evidence permitting an inference of disparate treatment. As in employment discrimination cases, labor discrimination cases employ a burden shifting paradigm. The NLRB must establish a prima facie case by proving that union animus was a motivating factor in the employer's decision to discharge the employee. *NLRB v. Mini-Togs,* 980 F.2d 1027, 1032-33 (5th Cir.1993). If the Board establishes a prima facie case, the burden shifts to the employer to prove that it would have discharged the employee even if the employee had not engaged in union activity. *Id.*

"Motive is a factual matter ... and the Board reasonably may infer motive from the circumstances surrounding the employer's actions, as well as from direct evidence." *Id.* However, an anti-union attitude cannot lightly be inferred onto an employer with a history of good union relations, and "mere suspicions of unlawful motivation" are insufficient to establish violations of

11

the NLRA.  *See Delco-Remy Div., General Motors Corp. v. NLRB,* 596 F.2d 1295, 1305 (5th Cir.1979).  Nevertheless, an inference of union animus based upon disparate treatment can be made if the only difference between two differently treated employees is the illegitimate criteria at issue (i.e., union activity).  *See Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.1980), *cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980) (discussing disparity in the context of a race discrimination case).  When there is unjustified disparate treatment between union and non-union employees designed to induce union employees to abandon their union, section 8(a)(3) of the NLRB Act is violated. *Russell-Newman Mfg. Co. v. NLRB,* 406 F.2d 1280, 1282 (5th Cir.1969).

Though the NLRB may make inferences to establish anti-union motive or disparate treatment, the inferences must be reasonable and must be supported by substantial evidence.  "If the Board's ultimate factual conclusions rest on inferences from the evidence, we cannot uphold the findings if these inferences are implausible." *Mini-Togs,* 980 F.2d at 1035.  In the present case, the ALJ's inferences stem directly from Asarco's long history of undisciplined horseplay.  The ALJ notes that supervisors had engaged in horseplay more serious than Halford's water bag prank. The ALJ inferred union animus from Asarco's drastic departure from its horseplay policy coupled with the level of Halford's union activities and the timing of his discharge.

We find that the record presents insufficient direct evidence

12

of disparate treatment and presents inadequate evidence from which disparate treatment reasonably may be inferred. Accordingly, we can only conclude that the ALJ has made impermissible inferences from the evidence presented. An anti-union attitude cannot be lightly inferred onto an employer which has enjoyed a history of good union relations, unless there is substantial evidence supporting the inference. We find that Halford is guilty of more than executing a harmless prank. Halford violated safety rules, blatantly lied to management, and neglected his charge floor duties for the second time in two months.

Nothing in the record supports the ALJ's assumptions that Asarco disciplined Halford differently because of his union activity. First, the ALJ's credibility determinations are inconsistent with the inference of union animus which he finds.[4] The ALJ expressly found that Owsley was an almost perfect witness; however, he apparently rejected Owsley's testimony regarding the reasons he discharged Halford. Further, the incidents of horseplay described by Farmer did not involve dangerous pranks, dishonesty, or neglect of duty. Considering the credibility determinations, which we must accept, the ALJ should have concluded that union

_____

[4]The ALJ discredited all of Halford's testimony that was not corroborated or that was in dispute. He similarly limited the weight given to the testimony of Halford's co-workers, Huddleston and Muehling, because they appeared biased for Halford. He found Thompson less than perfect but more credible than Halford, Huddleston, and Muehling. The ALJ found McLean to be "absolutely truthful," but limited the weight given to McLean's testimony because McLean could see things only in one dimension. The ALJ credited Farmer's testimony as having "the very ring of truth to it," and found that Owsley made a "good, if not perfect, impression for veracity and credibility."

13

activity did not factor into the discharge decision and that the previous horseplay incidents could not properly be compared to Halford's water bag prank because Halford's prank involved other rule violations.

Second, the parties conceded during oral argument that Owsley, who ultimately decided to terminate Halford, was completely unaware of Halford's complaints to Dave Woodbury regarding the company's slow handling of the Union's grievances. Consequently, the ALJ's inference that the timing of the discharge demonstrated union animus is completely meritless.

Third, the record demonstrates that Halford actively filed grievances throughout his tenure as union president. Asarco had tolerated Halford's performance of his duties as chair of the grievance committee and then president since 1980 and had cooperated with the amicable resolution of the grievances during Halford's reign. At the time of discharge, Halford was doing exactly what he had done all along. Further, the company had previous opportunities to discharge Halford because on several occasions he had committed infractions of the company's rules that would have justified summary discharge. There is absolutely no evidence establishing a reason or motive for Asarco to retaliate against Halford by discharging him. Accordingly, we are not persuaded that an inference of anti-union animus arises because Halford was an aggressive union president.

Finally, the record does not supply, and the parties could not present during argument, any other horseplay incidents involving

14

the additional factors (injury, dishonesty, and unsatisfactory job performance) justifying Halford's termination.  The testimony of Farmer, to which the ALJ gave great weight, presented several incidents of horseplay, but the pranks did not involve the aggravating factors present in Halford's case.  During oral argument, Asarco confirmed that the company did not have in place a procedure for investigating horseplay incidents in the past.  Without documentation of past pranks, no one can verify the severity of injuries that prior pranks may have caused.  If no investigation occurred, there would have been no opportunity for an employee to lie to investigating managers or for the employee's potential neglect of duty to be assessed.  It is clear to us that because previous incidents of horseplay had not been investigated, there is no evidence to prove that Asarco departed from its usual practice in handling a horseplay incident that also involved other violations.  This was the first documented, investigated prank that violated safety regulations, involved dishonesty, and established neglect of duties.  Accordingly, no comparison logically can be made and no disparity can be proven.

The Act does not prevent an employer from disciplining an employee for violating established company rules and policies, especially when the discipline is provided in a manner consistent with discipline given for similar conduct in the past. *See Delco-Remy,* 596 F.2d at 1305 (the court reversed the ALJ's findings that the company, which had a peaceful history with the union, violated the NLRA because the active union employee committed a

dischargeable offense by arriving to work late and then falsifying his time card on more than one occasion); and *Mini-Togs*, 980 F.2d at 1033 (the court reversed the NLRB's finding of a violation; the conclusions were not supported by substantial evidence because the union employee was not the first employee disciplined for directing profanity at a co-worker and because the record amply demonstrated that the company's discipline was consistent with similar profanity incidents in the past). We find that the ALJ's inferences of disparate treatment constitute "mere suspicions of unlawful motivation," which are insufficient to establish violations of the NLRA.

Having rejected the ALJ's inferences, we still must determine whether Asarco discharged Halford pursuant to established company policy. It is not disputed that Asarco had long-established policies regarding safety, honesty, and neglect of duties. McLean testified that employees had been terminated for these violations. First, a switchman who directed an engineer to couple into cars that were chalked and flagged with a dock plate was discharged because people were working in and around the cars. Similarly, Asarco discharged another employee who neglected to turn on the cooling water and caused a molten explosion. Further, the company discharged two employees who refused to shave, which was necessary to obtain the proper fit and seal from the respirator. Second, dishonesty has resulted in discharge at Asarco's Amarillo plant. An employee who falsified her employment application was discharged when the company discovered the falsification. Likewise, two

16

employees were terminated for supplying false doctor bills and slips to explain their absences from work. Employees have also been discharged for engaging in theft. Third, dereliction of duties has resulted in several employee dismissals.

The NLRB attempts to distinguish Asarco's previous discharges because they did not involve horseplay. We cannot accept the Board's reasoning. Halford violated three existing policies, any one of which would have justified his termination. Further, Halford had been suspended two months before for the same offense: dereliction of duty and unsatisfactory work performance. Asarco's rules authorized dismissal for the three violations individually and for Halford's repeat violation.

We conclude that Halford is not insulated from discharge simply because he is the first employee to violate three policies simultaneously. A violation of the Act is not established simply because an employee is first to be disciplined under existing policy. *See Central Freight Lines, Inc. v. NLRB,* 653 F.2d 1023, 1026 (5th Cir.1981) (the court found no evidence of disparate treatment where the company established a strict three-accident policy in 1977, the policy was announced to employees at a meeting in 1978 before the Union organized, and the discharged union employee happened to be the first and only driver to violate the three-accident rule after the policy was announced). The NLRA does not provide immunity to an employee because of his status as union president. *See Florida Steel Corp. v. NLRB,* 529 F.2d 1225, 1234 (5th Cir.1976) (holding that union membership cannot protect

17

flagrant insubordination where the employer's discipline was not motivated by anti-union animus); and *NLRB v. Mueller Brass Co.,* 509 F.2d 704, 711, 713 (5th Cir.1975) (noting that the NLRA was not intended "to insulate every union activist from investigation and discipline for violation of company rules"). To hold otherwise would give to the union president a license to disregard his employer's rules and would leave the employer with no legal recourse to correct an inexcusable wrong.

Moreover, the presence of the horseplay does not excuse Halford's underlying violations. Asarco has never expressly nor impliedly departed from its policy to discipline employees for violating rules regarding safety, honesty, and job performance. We find that nothing in the Act prevents Asarco from adjusting its liberal policy regarding horseplay to authorize discipline when a particular prank violates another existing policy. *See NLRB v. O.A. Fuller Super Mkts., Inc.,* 374 F.2d 197, 200 (5th Cir.1967) (noting that when no anti-union animus exists, an employer is free to discharge a union employee "for a good reason, a bad reason, or no reason at all"); *see also Omni Int'l Hotels, Inc. v. NLRB,* 606 F.2d 570, 574 (5th Cir.1979) (same); and *Southwest Latex Corp. v. NLRB,* 426 F.2d 50, 57 (5th Cir.1970) (same). Halford was well aware that discharge could result from violating safety regulations, lying to his supervisor, or neglecting his duties. He testified that he received an Asarco Employee Handbook, which expressly lists dishonesty, unsatisfactory work performance, and safety violations as grounds for summary termination. Though

18

Halford did not read the handbook when received, the labor agreement between the Union and Asarco clearly obligated Halford to familiarize himself with the company's rules. Thus, it is of no moment that Halford did not receive a specific warning that horseplay would not excuse these violations. We agree with the ALJ's finding that Halford's actions warranted discharge under the circumstances. Therefore, we hold that Halford has not proven by a preponderance of the evidence that Asarco unlawfully discharged him.

C. *SECTIONS 8(a)(1) AND (5) VIOLATIONS.*[5]

Though the heart of this appeal pertains to the discharge of Halford, two issues remain which are an integral part of the labor/management relationship at stake in cases such as this one. The duty to comply with discovery requests during the grievance process is an ongoing concern which warrants comment in the context of this case. Moreover, because Halford continues to work in the Union office even after discharge, we deem it appropriate to address the issue concerning Asarco's continued relationship with

_____

[5]The United States Code provides in pertinent part as follows:

> It shall be an unfair labor practice for an employer—
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157];
>
> (5) to refuse to bargain collectively with the representatives of his employees.
>
> ....

29 U.S.C. § 158(a)(1), (5).

19

him.  We, therefore, proceed to address these issues below.

1. *Refusal To Provide Discovery Information.*

Asarco argues that the witness list requested from it was equally accessible to the Union.  Asarco contends that it did not have a duty to provide the list in the present case because the Union already had access to the information it needed to process the grievance through arbitration.  Halford already knew the identities of the people who witnessed the water bag incident and the identities of the employees interviewed by Thompson, Bryant, McLean, and Owsley.  As the Union's president, he had access to the telephone numbers and addresses of those individuals.

The ALJ found that Asarco had a duty to provide information to the Union which would help it handle Halford's grievance.  Asarco has a duty to provide discovery-type data that is relevant and will be used by the Union in fulfilling its statutory obligations.  The ALJ rejected Asarco's excuse for not producing the lists of information readily available to the Union.  The ALJ concluded that the identities of the witnesses the Union intended to use in handling the grievance were only in the minds of Asarco's officials.

We agree that Asarco has violated the Act by failing to comply with the request for information.  The law clearly establishes that Asarco had a duty to produce to the Union requested information which was relevant and needed to handle grievances.  *See NLRB v. Acme Indus. Co.,* 385 U.S. 432, 435-36, 87 S.Ct. 565, 567-68, 17 L.Ed.2d 495 (1967);  *NLRB v. Leonard B. Hebert, Jr. & Co.,* 696 F.2d

20

1120, 1124 (5th Cir.1983); and *NLRB v. J.P. Stevens & Co.,* 538 F.2d 1152, 1164-65 (5th Cir.1976). Asarco's excuse that it withheld the documents because Halford knew who had witnessed the incident and who had been interviewed is unpersuasive. The Union wanted to know the identities of the witnesses Asarco would use in handling the grievance. Halford could not assume that the company would use all of the people who witnessed the incident. Further, he did not necessarily know all of the people whom the company interviewed regarding the grievance. We find that the Board's request was relevant to the discharge of its duties. Therefore, we hold that the Board correctly found that Asarco violated the Act by ignoring the discovery request.

2. *Refusal To Deal With Halford After his Discharge.*

Asarco argues that after Halford's discharge, it continued to recognize him as the Union president. Asarco met with Halford several times to discuss collective bargaining issues after Halford's discharge. Halford continued to participate in grievance meetings. Further, Asarco noted that the two events to which Halford was denied access had nothing to do with Halford's duties as the Union president. Asarco maintains that its treatment of Halford was consistent with his status as a discharged employee.

On the other hand, the NLRB argues that only upon proof of extraordinary circumstances demonstrating that the designated representative presents a clear and present danger to the collective bargaining process, can the employer refuse to deal with the employees' designated agent. Further, the NLRB argues that

Halford's "discharge" status did not justify the exclusion.

The ALJ found that because Asarco refused to deal with Halford as it had done for years, Asarco violated section 8(a)(5) of the NLRB Act. We disagree. Though the NLRA guarantees employees the right to choose their own representative, *see* 29 U.S.C. §§ 157, 159, it does not require the union representative's presence at non-union functions.

If Asarco feared that Halford would disrupt the plant's production or would jeopardize the bargaining process, it had to prove "special circumstances" justifying Halford's exclusion from any collective bargaining events at issue. *See General Elec. Co. v. NLRB,* 388 F.2d 213, 214 (6th Cir.1968).[6] We agree with our sister circuits that an employer may only exclude the Union's chosen representative from union activities, even where the representative has been discharged, when it proves "special circumstances," demonstrating that the representative's presence

---

[6]In *General Electric,* although the employer denied the former union president admission to the plant's production areas after discharge, the court found no violation of section 8(a)(5) because "special circumstances" absolved the employer from dealing with the union's designated representative. 388 F.2d at 214. The court found the employer's reservations reasonable because the former president's past actions, which resulted in a planned employee work slowdown, made him untrustworthy. The past actions led the employer to believe that the former president's admission to the production areas might cause employees to cease work and interfere with production. *See also, NLRB v. Indiana & Michigan Elec. Co.,* 599 F.2d 185, 190 (7th Cir.1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980) (absent extraordinary circumstances, an employer violates section 8(a)(5) by refusing to deal with the union's selected representatives); and *General Elec.,* 412 F.2d at 517 (requiring that the employer prove that the chosen representative's presence creates a "clear and present danger to the collective bargaining process").

22

will jeopardize the company's business enterprise or the bargaining process. However, in the present case, we do not reach the "special circumstances" inquiry as the Board suggests. The special circumstances inquiry only arises when the union's rights are violated, that is when the union's representative is excluded from an activity expressly covered by the NLRA or the union agreement. We find that the events of which Halford complains are not union activities.

Halford first complains that Asarco violated the NLRA by excluding him from an OSHA inspection. Nothing in the OSHA regulations or collective bargaining agreement requires Halford to accompany the OSHA representative on an inspection. Further, we find that Halford's own testimony proves that the inspection did not require his presence as the Union's representative. During Halford's cross-examination, he testified that the Union had a joint safety committee that is appointed by him as the Union president. The joint safety committee conducts tours with the company in three designated areas of the plant. Only if the safety committee representatives find a problem that cannot be resolved by them do they bring it to Halford's attention to remedy. Halford conceded that, as president, he had delegated the duty of making plant inspections to the designated safety representatives. The record does not contain testimony demonstrating that Halford deviated from this policy of delegating the responsibility of attending OSHA inspections.

Halford also complains that Asarco violated the NLRA by

23

excluding him from a meeting scheduled to welcome an Asarco official to the company. We find that the meeting was primarily social in nature and did not include collective bargaining discussions. The ALJ concluded that Asarco violated the Act because it had reneged on a previously arranged agreement to allow Halford's attendance. The record does not support this conclusion. The record does not demonstrate any long-standing practice, that might be called a custom, in which the Union's president routinely was invited to socialize or otherwise visit informally with Asarco's out-of-town officials.

Our conclusion that Halford's complaints do not involve union activities precludes a finding that Asarco violated the Union's rights. Because union activities are not implicated, Halford's complaints are purely personal and not protected by section 8(a)(5). Asarco had no obligation to permit Halford, an individual, to participate in the kinds of non-union events at issue here after he has been validly terminated, regardless of his elected union office. Moreover, once validly discharged as an Asarco employee, Halford could not raise his individual complaints. We conclude that the ALJ's finding that Asarco violated the Act by refusing to bargain with Halford is not supported by substantial evidence in the record. We therefore hold that Asarco did not violate sections 8(a)(1) and 8(a)(5) by excluding Halford, the Union president, from non-union functions after a valid discharge.

CONCLUSION

For the foregoing reasons, we hold that the Board's findings

24

of unlawful discharge are not supported by substantial evidence. Accordingly, we DENY ENFORCEMENT of the Board's ruling that Asarco unlawfully discharged Halford in violation of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. We also DENY ENFORCEMENT of the Board's order granting Halford back pay and full reinstatement to his former job or an equivalent one. Upholding the validity of Halford's discharge, we find that Asarco's exclusion of Halford from two *non-union* events did not violate the Union's rights and, consequently, did not violate sections 8(a)(1) and 8(a)(5). Notwithstanding our determinations regarding the discharge and the exclusions, we hold that the Board correctly found that Asarco violated sections 8(a)(1) and 8(a)(5) by refusing and failing to provide the requested discovery documents. We, therefore, REMAND this case to the NLRB for issuance of a MODIFIED order directing that Asarco refrain from further violating sections 8(a)(1) and 8(a)(5) of the Act. As modified, we GRANT ENFORCEMENT of the Board's cease and desist order.

.    .    .    .    .