# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60257

DIRECTV HOLDINGS, L.L.C.,

Petitioner, Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner

United States Court of Appeals
Fifth Circuit

**FILED**
May 31, 2016

Lyle W. Cayce
Clerk

On Petitions for Review of an Order
of the National Labor Relations Board
NLRB No. 21-CA-39546

Before KING, SOUTHWICK, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:*

DIRECTV Holdings, L.L.C. ("DirecTV") petitions this court for review of a final order of the National Labor Relations Board ("NLRB"), which affirmed the determination of the Administrative Law Judge ("ALJ") that DirecTV unlawfully discharged Gregory Edmonds due to his union activity. The NLRB cross-petitions for enforcement of the order.[1] Because we determine that the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Both petitions concern only the NLRB's decision regarding Edmonds. The lawfulness of DirecTV's work rules and policies is not before us.

No. 15-60257

decision of the ALJ was not supported by substantial evidence, we GRANT the petition for review and DENY the cross-petition for enforcement.

## I. Factual and Procedural Background

DirecTV provides satellite television to its customers. Gregory Edmonds began working for DirecTV Home Services as an Installer in the fall of 2007. He worked out of DirecTV's Riverside facility, at which Freddy Zambrano was the Site Manager. Scott Thomas was the Regional Director of Operations, and Adrian Dimech was the Vice President of Operations for Southern California, including the Riverside facility. The International Union of Machinists and Aerospace Workers filed a charge with the NLRB, alleging in part that Edmonds was terminated for engaging in protected activity. Beginning on July 19, 2011, a two-day hearing was conducted before the ALJ.

According to the evidence presented before the ALJ, during Edmonds's tenure at DirecTV, he scored well for customer satisfaction and received two raises. Edmonds testified before the ALJ that Zambrano asked him to apply for a supervisor position, although Edmonds ultimately decided not to submit an application. At the same time, however, Edmonds was subject to corrective actions on nine occasions while employed at DirecTV, and, for the most part, these corrective actions concerned performance issues. He received seven warnings, at least two of which were "final" warnings, meaning that future incidents could be grounds for termination.

At some point in the spring or summer of 2010, Edmonds met with union representatives at the home of his coworker Brandon Ojeda. According to Edmonds, the union representatives told him to get a feel for who would be interested in joining the union, and Edmonds subsequently spoke to several coworkers about this topic.

After the meeting at Ojeda's home, on a Saturday morning in either May or June of 2010,[2] there was a mandatory meeting at the Riverside facility. The precise purpose of and topics discussed at this meeting are the subject of some dispute between the parties. According to Dimech, who led the meeting, its purpose was to notify the Riverside facility about the results of a union election that had occurred at the Rancho Dominguez facility.[3] According to Edmonds, Dimech was inquiring about what issues he could address because "[i]f everything was taken care of on that level, then there really wouldn't be a need for a union in his mind." Edmonds further testified that at the meeting, he complained about not being compensated for time that he spent driving to help the facility in San Diego, as well as other compensation issues. He also testified that he stated that "if we were a collective body[,] . . . maybe the company might hear us," and that in response to this comment Dimech "just kind of turned red faced and didn't really have much of a response at all."

Immediately following this meeting, Dimech approached Edmonds to discuss what he could do about the issues that were brought up at the meeting. He also gave Edmonds his business card. Corporate later informed Edmonds that he was going to be paid for the travel-time issue that he raised at the meeting. Edmonds testified that a couple of days after the meeting, Zambrano said, "[w]ell, we're going to go out and [Quality Control] all of [Edmonds]'s jobs today." Quality control refers to quality checks on an installer's work. A coworker who overheard the comment testified that it was equivalent to saying that Edmonds was going to be kept under surveillance.

---

[2] The precise date of this meeting was a matter of dispute before the ALJ, and the ALJ did not make a finding as to the date of the meeting. While DirecTV contended the meeting occurred on May 22, 2010, the General Counsel maintained it did not occur until June.

[3] The ALJ apparently discredited this testimony, finding that Dimech attended the meeting to prevent the unionization efforts at Rancho Dominguez from spreading to Riverside.

No. 15-60257

The parties also entered evidence relating to two incidents that occurred May 30, 2010, and June 14, 2010, respectively. On May 30, 2010, Edmonds was involved in a car accident while driving the company vehicle. On June 14, 2010, a customer complaint was elevated to the Office of the President. In this complaint, a customer alleged that Edmonds was late to an appointment and did not adequately apprise him of the actual arrival time. Edmonds was not disciplined for either of these incidents.

On the morning of July 21, 2010, Edmonds was waiting to get equipment for his day's work,[4] when he saw Zambrano enter the warehouse. In front of approximately fifty coworkers, Edmonds told Zambrano, "Freddy, can't you do something about this f*ing line? I stand in this f*ing line ten hours a day." In response, Zambrano walked over to Edmonds, put his arms out, and said "[n]obody cut in front of Greg. Okay?"

The next day, Edmonds's supervisor told him that Zambrano wanted to talk to him. Zambrano gave Edmonds an Employee Consultation Form that noted Edmonds was being suspended for insubordination due to the July 21 incident. Edmonds subsequently apologized to Zambrano for his outburst. According to Edmonds, when he asked Zambrano if he was going to be fired, Zambrano responded, "No. When you get back from your suspension, you'll go back to work." After the suspension, however, Zambrano told Edmonds that after talking with Scott Thomas and the human resources department,

---

[4] The wait to get equipment was a large source of frustration among installers. Edmonds testified that on some occasions he would wait for materials upwards of an hour. Installers are paid on a piecework basis for the installations they complete. The more installations they complete, the more money they make. However, they also have an hourly rate if an Installer does not make a certain amount of pay via the piecework pay system. Edmonds was concerned that by waiting in line, he had less time to complete installations, and thus his effective hourly rate would be lower.

Edmonds's employment was being terminated. According to Zambrano,[5] he had to advise Thomas and human resources of termination decisions, and Zambrano told an employee from human resources that he reviewed Edmonds's personnel file and Edmonds was on a final warning. Zambrano testified that he made the decision to terminate Edmonds on July 23.

Edmonds was not the only employee to be terminated for directing profanity at a superior. DirecTV entered evidence of six other employees who were disciplined in the Southern California region for similar conduct.

After the hearing, the ALJ determined that Edmonds had been engaged in protected union activity, but that the July 21, 2010, outburst did not itself constitute protected activity. He further determined that DirecTV was aware of this activity and disliked unionization. Ultimately, the ALJ concluded that Edmonds was discharged in violation of the National Labor Relations Act ("NLRA"). After a lengthy procedural history,[6] the NLRB issued the order at issue in this case on March 31, 2015, affirming the decision of the ALJ as it related to Edmonds's termination. DirecTV now petitions this court for review of the NLRB's decision, and the NLRB cross-petitions for enforcement.

---

[5] The ALJ found that Zambrano was not a credible witness because he "gave succinct responses to leading questions in a manner that he believed would be most beneficial to [DirecTV]'s position, regardless of their accuracy."

[6] The NLRB issued its initial order in this case on January 25, 2013, and the parties petitioned the Ninth Circuit for review and enforcement of that order. While that petition was pending, the Supreme Court issued *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), wherein it determined that the appointments of three members of the NLRB were invalid. In accordance with *Noel Canning*, the Ninth Circuit remanded the case to the NLRB for further consideration. In its March 31, 2015, decision and order, the NLRB reviewed the ALJ's decision de novo as well as the NLRB's January 25, 2013, decision and order. The NLRB generally agreed with the rationale set forth in the January 25, 2013, decision and order, and incorporated its reasoning by reference.

No. 15-60257

## II. Jurisdiction and Standard of Review

We have jurisdiction to review or enforce the NLRB's order pursuant to 29 U.S.C. § 160(e) and (f).

We will affirm the NLRB's factual findings if they are supported by substantial evidence on the record, considered as a whole. *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 476 (5th Cir. 2001). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (emphasis omitted) (quoting *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993)). Under this deferential standard of review, "the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance." *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1314 (5th Cir. 1988). Furthermore, we are bound by the ALJ's credibility determinations unless "(1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice." *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996) (citing *NLRB v. Motorola, Inc.*, 991 F.2d 278, 282 (5th Cir. 1993)).

We review questions of law de novo, but will defer to the NLRB's legal conclusions if they are reasonably grounded in the law and not inconsistent with the NLRA. *Poly-Am*, 260 F.3d at 476.

## III. Discussion

### A.

Under the NLRA, an employer may not engage in "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C.

No. 15-60257

§ 158(a)(3). Additionally, an employer may not "interfere with, restrain, or coerce employees in the exercise of [their collective bargaining rights]." *Id.* § 158(a)(1).[7] An employer violates the NLRA by taking an adverse employment action against an employee for engaging in protected union activity. *New Orleans Cold Storage & Warehouse Co., Ltd. v. NLRB*, 201 F.3d 592, 600 (5th Cir. 2000).

Under the so-called *Wright Line* test, the NLRB's General Counsel must first establish that the employee's protected union activity was a motivating factor in the employer's adverse employment decision. *Id.* at 600–01 (adopting the test set forth in *Wright Line*, 251 N.L.R.B. 1083 (NLRB 1980)). Once the General Counsel meets this burden, the burden shifts to the employer to show that the adverse employment action would have occurred in the absence of the protected activity. *Id.* at 601.

B.

Evidence supporting the "motivating factor" determination is very weak. Evaluating this issue is complicated by the lack of ALJ finding on when the disputed "May or June" meeting occurred. If it occurred in May, then Zambrano's failure to use the car accident and customer complaint to fire Edmonds substantially undercuts the "motivating factor" conclusion. *See Asarco*, 86 F.3d at 1409; *Vermeer Mfg. Co.*, 187 N.L.R.B. 888, 892 & n.30 (NLRB 1971). However, even if we assume arguendo that Edmonds's protected union activity was a motivating factor in his termination, we conclude that the NLRB's determination that DirecTV failed to establish that it would have

---

[7] "Although §§ [158(a)(1)] and (a)(3) are not coterminous, a violation of § [158(a)(3)] constitutes a derivative violation of § [158(a)(1)]." *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

terminated Edmonds in the absence of his protected union activity was not supported by substantial evidence.

It was undisputed that on July 21, 2010, Edmonds directed profanity toward his superior, Zambrano, in front of numerous coworkers.  It was also undisputed that Edmonds had a lengthy disciplinary history at DirecTV, and had received nine violations in a period of less than three years.  On multiple occasions, DirecTV warned Zambrano that "[i]mmediate satisfactory and sustained improvement must be shown or further disciplinary action may be taken up to and including termination."  In fact, at the time of the July 21, 2010, incident, Zambrano was on a final warning, meaning that he could be terminated for further violations.

The ALJ's decision set forth Edmonds's disciplinary history, but the ALJ engaged in minimal discussion regarding the implications of this tarnished record.  The mere fact that Edmonds was not fired for previous violations should not be used against DirecTV.  *See Delco-Remy Div., Gen. Motors Corp. v. NLRB*, 596 F.2d 1295, 1306 (5th Cir. 1979).  Moreover, in a case in which the employee had a similar work history, we determined that the record lacked substantial evidence to support the NLRB's conclusion that the employer had not met its burden to show that it would have discharged the employee in the absence of the union activity.  *Poly-Am.*, 260 F.3d 465.  In *Poly-America*, "[t]he uncontradicted evidence in the record [was] that [the terminated employee] did not follow safety regulations with respect to his goggles, insulted one of his supervisors, and voiced his dislike for his job with frequency."  260 F.3d at 491.  Although the employee was in a probationary period in *Poly-America*, there was no evidence that the company treated the employee's probation different from other employees' probation.  *Id.*  In the case currently before us, the record reflects that Edmonds accumulated a substantial disciplinary history, and

although he scored well on customer satisfaction,[8] he had a string of issues with his work performance and directed profanity at his supervisor in front of other employees.[9]

Moreover, "[w]e have often observed that the essence of discrimination in a [29 U.S.C. § 158(a)(3)] violation consists of treating like cases differently." *Delco-Remy*, 596 F.2d at 1305 (citation omitted). "The [NLRA] does not prevent an employer from disciplining an employee for violating established company rules and policies, especially when the discipline is provided in a manner consistent with discipline given for similar conduct in the past." *Asarco*, 86 F.3d at 1409.

Although our review is deferential, "a decision by the Board that 'ignores a portion of the record' cannot survive review under the 'substantial evidence' standard." *Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013) (quoting *Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983)). Our deference has limits; we review the record *as a whole. Id.* DirecTV entered evidence that six[10] employees were terminated for using profanity, and some of these

---

[8] Similarly, the employee in *Poly-America* received occasional praise for his work. 260 F.3d at 491.

[9] Our opinion in *Poly-America* raises significant concerns about whether, given Edmonds's work history, the decision of the NLRB was supported by substantial evidence. While the dissenting opinion is correct in noting that there are distinctions between this case and *Poly-America*, that case makes clear that the NLRB cannot ignore evidence of disciplinary history. Here, the NLRB did not adequately address the effect of Edmonds's disciplinary history on its decision, and "a decision by the Board that 'ignores a portion of the record' cannot survive review under the 'substantial evidence' standard." *Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013).

[10] The NLRB contends that the discipline of five of these employees is not relevant because they did not work out of the Riverside facility, but rather worked out of other facilities in the Southern California region. But the ALJ, and subsequently the NLRB, determined that somebody intervened to change Zambrano's mind about termination, and the only individuals identified as possibly being this intervenor worked at the regional level, not just at the Riverside facility. In fact, the individual at whom the charge of anti-union sentiment was perhaps most heavily directed throughout the hearing, Dimech, worked at the regional level. Accordingly, for comparison purposes, it is appropriate to consider employees

terminations were based on conduct less flagrant than Edmonds's outburst. The ALJ, however, considered only one of these employees, John Barrios, and found the conduct underlying Barrios's termination to be distinguishable. Similarly, the NLRB did not address the remaining five employees. Given the evidence as a whole, we conclude that the NLRB's decision that DirecTV failed to meet its burden to establish that it would have terminated Edmonds in the absence of his union activity is not supported by substantial evidence.

Although the General Counsel attempted to rebut this evidence with testimony that profanity was somewhat commonplace in the workplace, there was no evidence that employees directed profanity at supervisors in front of a warehouse full of employees in a manner that would undermine the supervisor's authority without repercussion.[11]  Rather, the evidence showed that employees used profanity among themselves or in discussions and private meetings with supervisors.  Moreover, there was no evidence that any of the individuals that generally used profanity had the same extensive disciplinary history or that any of these employees were on a final warning.

Finally, the NLRB makes much of the fact that Edmonds's initial suspension was transformed into a termination.  The ALJ found that because Zambrano told Edmonds that he would not be terminated, "someone

---

within the Southern California region, as this unit was an alleged source of discrimination, not just the Riverside facility.

[11] According to the ALJ,

> The record shows that employees, supervisors, and managers alike used profanity in the workplace.  The record does not show, however, any prior instances of employees cussing out supervisors or managers in the workplace, in the presence of other employees, for failing to do the job that employees expected them to do.  Accordingly, while there is precedent for the Respondent's acceptance of profanity in the workplace, there is no precedent for the Respondent's acceptance of profane outbursts in the workplace towards management.

intervened . . . to cause Zambrano to change his mind and convert the suspension to a termination." This statement is unsupported speculation. *See Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 639 (5th Cir. 2003) (noting that although a finding of a violation "may be supported through circumstantial, rather than direct evidence, . . . [t]hat evidence . . . must be substantial, not speculative, nor derived from inferences upon inferences"); *cf. Berry Sch. v. NLRB*, 627 F.2d 692, 704 (5th Cir. 1980) (determining that "inferences about events which might have happened 'behind closed doors,'" were "speculations unsupported by the evidence"). But even crediting this conclusion, this circumstantial evidence does not undermine the uncontradicted evidence in support of DirecTV's position that it would have fired Edmonds anyway, namely Edmonds's extensive disciplinary history and the termination records for employees engaged in similar conduct. "[A] company may discharge an employee even where union activity is a motivating factor in that discharge if the company can prove that the termination decision would have been the same regardless of the protected conduct." *Poly-Am.*, 260 F.3d at 491. Substantial evidence does not support the NLRB's decision that DirecTV failed to meet this burden.

For the foregoing reasons, the NLRB's determination that DirecTV violated the NLRA by terminating Edmonds is not supported by substantial evidence. Accordingly, DirecTV's petition for review is GRANTED, and the NLRB's petition for enforcement is DENIED. The NLRB's order is set aside in accordance with this opinion.

No. 15-60257

KING, Circuit Judge, dissenting:

Substantial evidence supports the NLRB's decision.  And substantial evidence supports the majority's decision.  In that situation, we are bound to enforce the NLRB's decision.  Accordingly, I would deny DirecTV's petition for review and grant the NLRB's petition for enforcement.

This court reviews the NLRB's factual determinations[1] under the substantial evidence standard announced by the Supreme Court in *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951).  *See NLRB v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1339 (5th Cir. 1993).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion," *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (quoting *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993)), and "the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if" this court would have reached a different conclusion had it heard the case in the first instance, *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1314 (5th Cir. 1988).  "In determining whether the Board's factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence."  *NLRB v. Allied Aviation Fueling*, 490 F.3d 374, 378 (5th Cir. 2007); *accord Ill. Cent. R.R. Co. v. Norfolk & W. Ry. Co.*, 385 U.S. 57, 69 (1966) ("It is not for the court [on substantial evidence review] to strike down conclusions that are reasonably drawn from the evidence and findings in the case.").  And "[o]nly in the most rare and unusual cases will an appellate court conclude that a finding of fact made by the . . . Board is not supported by substantial evidence."  *Merchs. Truck Line v. NLRB*,

---

[1] As does the majority, I focus on the ALJ's decision as opposed to the NLRB's decision here because the ALJ engaged in the initial fact-finding with which the NLRB agreed.  *See, e.g., N.L.R.B. v. Gulf States United Tel. Co.*, 694 F.2d 92, 95 (5th Cir. 1982) (focusing on the findings of the ALJ, which were later adopted by the NLRB).

577 F.2d 1011, 1014 n.3 (5th Cir. 1978) (quoting *Ward v. NLRB*, 462 F.2d 8, 9 (5th Cir. 1972)).

Before turning to the application of the substantial evidence test here, I briefly recount the relevant facts and procedural history to provide greater context for that test. Applying the two step analysis from *Wright Line, a Div. of Wright Line, Inc.*, 251 NLRB 1083 (1980), the ALJ in this case concluded that (1) Gregory Edmonds's protected union activity was a motivating factor in DirecTV's decision to terminate Edmonds and (2) DirecTV failed to establish that it would have terminated Edmonds absent his protected activity. In reaching these conclusions, the ALJ made a number of specific factual findings. As to Edmonds's history, the ALJ noted that, while Edmonds was not a model employee given his disciplinary record, he had received higher-than-average customer satisfaction ratings, been recommended to apply for a supervisor position, received the highest salary possible given his position following several raises, and attained the classification of "service technician" based on his demonstrated skills and the work that he could competently perform. The ALJ noted that Edmonds first engaged in union activity in the spring or summer of 2010, when he met with union representatives at the home of coworker Brandon Ojeda.

Following the Ojeda meeting, in either May or June of 2010, Adrian Dimech, a DirecTV superior, conducted a meeting at the Riverside facility and expressed his opposition to unionization of the employees at that facility. At the Dimech meeting, Edmonds voiced several complaints and implied a desire for the employees at the Riverside facility to unionize. A few days after this meeting, Freddy Zambrano informed Edmonds that all of his work in the field for the day would be monitored, reviewed, and evaluated (although apparently the monitoring, etc. never actually occurred). On July 21, 2010, Edmonds loudly cursed at his supervisor, Zambrano, in front of a number of other

13

employees, expressing concern about the long wait times required to obtain equipment. The next day, Zambrano suspended Edmonds, stating explicitly that Edmonds was not going to be terminated. However, during Edmonds's suspension, Zambrano communicated with Scott Thomas and the "HR department" and decided to terminate Edmonds.

Based on these facts, the ALJ found that Edmonds had been engaged in protected activity at the Dimech meeting, and that "Zambrano warned Edmonds that his work was to be monitored as a result of his protected . . . union activity." The ALJ further found that these actions, combined with Edmonds's subsequent suspension and firing, were sufficient under *Wright Line* to establish that Edmonds's protected union activity was a motivating factor in DirecTV's termination decision. Therefore, the ALJ concluded that DirecTV had the burden to prove that it would have terminated Edmonds absent his union activity under the second step of the *Wright Line* analysis.

With respect to the second step, the ALJ found that "from the date of the Dimech meeting until July 22, Edmonds was never disciplined . . . for any reason." When he received his initial suspension, Zambrano explicitly told Edmonds that he would not be terminated, and the form indicating his suspension did not include the term "pending investigation." Based on this, the ALJ found that "Zambrano had . . . decided . . . shortly after the incident . . . that Edmonds would be suspended but would not be discharged for his outburst." The ALJ then found that "someone intervened between July 22 [when Edmonds was initially suspended] and July 28 [when Edmonds was terminated] to cause Zambrano to change his mind and convert the suspension to a termination." The ALJ specifically discredited Zambrano's testimony that "he did not have his mind made up to discharge Edmonds" when Edmonds was initially suspended and noted that Zambrano "implicated others by telling Edmonds that after talking with Scott Thomas—Zambrano's boss and

Dimech's subordinate—and the HR department, it had been determined that his employment was being terminated." Based on these findings, the ALJ concluded that DirecTV had not "affirmatively demonstrated that whatever it was that caused Zambrano to change his mind and convert Edmonds'[s] suspension to a discharge was not motivated by unlawful considerations."

With respect to the first step of the *Wright Line* analysis, the majority characterizes the evidence supporting the ALJ's determination that Edmonds's union activity was a motivating factor in his termination as "very weak," especially given that the ALJ made no specific finding as to when the Dimech meeting occurred.[2] However, in light of the fact that Edmonds engaged in protected activity, was singled out shortly after this activity for monitoring, and was later terminated, a "reasonable mind" could accept this evidence as "adequate to support [the] conclusion" that Edmonds's union activity was a motivating factor in DirecTV's decision to terminate his employment. *El Paso Elec. Co.*, 681 F.3d at 656 (quoting *Spellman*, 1 F.3d at 360). Accordingly, I would hold that the ALJ's conclusion was supported by substantial evidence—even if that decision was not supported by a preponderance of the evidence—instead of simply assuming *arguendo* this conclusion, as the majority does. *See id.* ("[Substantial evidence] is more than a mere scintilla, and less than a preponderance." (emphasis omitted)).

---

[2] The majority also notes that, assuming the Dimech meeting occurred in May, DirecTV had two opportunities to terminate Edmonds that it did not take advantage of, suggesting that anti-union animus was not a motivating factor in its ultimate termination decision. Evidence introduced by the parties showed that Edmonds was involved in a car accident while driving a company vehicle in May 2010 and that a customer complaint concerning Edmonds was forwarded to the Office of the President in June 2010. However, the ALJ explicitly found that Edmonds was not responsible for the car accident and that the complaint lacked merit. Therefore, according to the ALJ, DirecTV had no opportunity to use these incidents to terminate Edmonds, so the failure to previously terminate Edmonds did not suggest a lack of anti-union animus in the ultimate decision to terminate Edmonds.

No. 15-60257

With respect to the second step of the *Wright Line* analysis, I similarly disagree with the majority's conclusion as to whether substantial evidence supported the ALJ's conclusion that DirecTV failed to carry its burden to show that it would have terminated Edmonds absent his union activity. The majority offers three general reasons for why substantial evidence did not support the ALJ's determination: (1) the "ALJ engaged in minimal discussion" of Edmonds's disciplinary record; (2) DirecTV has terminated at least six other employees for similar reasons as it terminated Edmonds; and (3) the ALJ improperly inferred, based on the evidence, that Zambrano's decision to terminate Edmonds was motivated by unlawful considerations. However, none of these reasons supports the conclusion that substantial evidence did not support the ALJ's conclusion.

As to the majority's first criticism of the ALJ's decision: while Edmonds did have a disciplinary record, he had also been promoted, received raises, and been invited to apply for a supervisor position. Therefore, the relative importance of Edmonds's disciplinary history and his workplace achievements in DirecTV's decision to terminate Edmonds was an inherently fact-intensive inquiry. And the ALJ ultimately emphasized Edmonds's achievements over his failings in the workplace in concluding that DirecTV would not have terminated Edmonds absent his union activity. Given the record before the ALJ, "a reasonable person could have found what the ALJ found," and I would not disturb that finding here.[3] *Standard Fittings Co.*, 845 F.2d at 1314.

---

[3] The majority's reliance on *Poly-Am., Inc. v. NLRB*, 260 F.3d 465 (5th Cir. 2001), in reasoning that this court has held that the termination of an employee in a similar situation as Edmonds was not supported by substantial evidence is misplaced. As the majority notes, the employee in that case was still on a probationary period. *Id.* at 491. And while the majority recognizes that the employee received occasional praise in addition to exhibiting disciplinary issues, *id.*, the praise received did not involve a promotion, multiple raises, and suggestions of applying for a supervisor position as in this case.

No. 15-60257

As to the majority's second criticism, the majority emphasizes that the ALJ discussed only one of the six other employees DirecTV had terminated for similar reasons as Edmonds. However, the ALJ did not conclude that Edmonds would not have been fired absent union activity because his disciplinary issues were less egregious than other employees' issues. Instead, the ALJ concluded that Edmonds would not have been fired for his profane outburst because he made a specific factual finding that Zambrano had decided not to terminate Edmonds before speaking to his superiors. This factual finding was independent of how DirecTV had addressed disciplinary problems with other employees in the past. The ALJ concluded that Zambrano only decided to terminate Edmonds after speaking with the HR department and Scott Thomas, inferring from the facts before him that Zambrano decided to terminate Edmonds as a result of anti-union animus following this discussion. This factual finding, combined with the ALJ's consideration of the only employee who had been terminated for profanity while working at the same facility as Edmonds, is sufficient to survive this court's substantial evidence review.[4]

With respect to the majority's final criticism, I cannot agree with the majority as to the impropriety of the ALJ's inference that Zambrano's conversation with his superiors caused him to change his mind and terminate Edmonds and that this change was motivated by unlawful considerations. As described above, the ALJ carefully analyzed the facts surrounding Zambrano's

---

[4] Moreover, I agree with the NLRB's explanation that these five other employees, who worked at a different facility than Edmonds, were not directly comparable to Edmonds and, thus, the ALJ was under no obligation to consider them. The majority claims that, because it was Zambrano's superiors who imparted anti-union animus to Zambrano's decision to terminate Edmonds, the proper point of comparison is all employees in the Southern California region. However, these other employees were not supervised by Zambrano, and other facilities may have enforced DirecTV's rules and policies differently.

change of heart and reasonably inferred that anti-union animus motivated Zambrano's termination decision after Zambrano admitted that he discussed Edmonds's punishment with his superiors. While I agree that this inference was not compelled based on the facts in the record, I would not hold that this inference was unreasonable.[5]

Granting that Zambrano's inference was reasonable, the majority concludes that "this circumstantial evidence does not undermine the uncontradicted evidence in support of DirecTV's position that it would have fired Edmonds anyway." However, "this circumstantial evidence" was anything but uncontradicted, as Zambrano had decided not to terminate Edmonds until he spoke with his superiors. Additionally, Edmonds's extensive workplace achievements, as emphasized by the ALJ, are evidence that DirecTV would not have terminated Edmonds absent his union activity.

Overall, the majority points to a number of reasons as to why the ALJ and NLRB could have reached a different result in this case. The majority correctly points out that substantial evidence supports findings contrary to those of the ALJ. However, the Supreme Court has explained that "[a] court reviewing an agency's adjudicative action should accept the *agency's* factual findings if those findings are supported by substantial evidence . . . [and] should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 112–13 (1992). Because I would conclude that substantial evidence supports the NLRB's decision in this case, I would deny

---

[5] Moreover, the ALJ's inference regarding Zambrano's motives in terminating Edmonds rested, at least in part, on the ALJ's finding that Zambrano was not a credible witness. And "this court will accord special deference to the [Board's] credibility findings." *Cal-Maine Farms*, 998 F.2d at 1339–40.

No. 15-60257

DirecTV's petition for review and grant the NLRB's petition for enforcement. I respectfully dissent.