United States Court of Appeals,

Fifth Circuit.

No. 91-5057.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MINI-TOGS, INC., Luv-N-Care, Inc., and Embroideries, Inc., A Single Employer, Respondent.

Jan. 12, 1993.

Application for Enforcement of an Order of the National Labor Relations Board.

Before POLITZ, Chief Judge, JOHNSON, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This National Labor Relations Board enforcement action arises from an effort by the United Steelworkers to organize Mini-Togs. In response to the union efforts, Mini-Togs mounted an intensive counter campaign to defeat the union. In the course of campaign speeches and conversations, many unlawful threats were alleged to have been made by Mini-Togs concerning the consequences of unionization. Some union adherents were laid off and some were fired outright. Unfair labor practice charges were filed with the Board, and now we are presented with the remnants of those charges—the rest have either been dismissed, settled, or not appealed. Today we address whether substantial evidence supports the Board's findings that Mini-Togs violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(3), by discharging Alice Faye Washington and Eric Coler and by laying off Patricia Gayden and Karen Miller for their union activities. We hold that the Board's findings as to Washington and Miller are not supported by substantial evidence; we further hold, however, that the Board's findings as to Gayden and Coler are supported by substantial evidence. Enforcement of the Board's order is therefore granted in part and denied in part.

I

On September 8, 1988, a representative of the United Steelworkers of America, AFL-CIO-CLC, met with approximately thirteen employees of Mini-Togs. Present at this meeting were Karen

Miller, Patricia Gayden, and Alice Faye Washington. The thirteen employees formed an organizing committee and signed union authorization cards. These and other employees then began regularly attending union meetings.

On September 13, 1988, Miller, a snap machine operator, was laid off. Miller's supervisor informed her that she was being laid off because of lack of work. The supervisor stated that Miller was the logical person to be laid off because she had been absent from work with the flu two weeks earlier. Later, the supervisor stated that Miller was chosen because she had an allergy or sinus problem that was aggravated when Mini-Togs printed garments with dyes. Miller was told she would be recalled when the work increased.

Later that same day, six sleeper line inspectors were discharged. Mini-Togs argued that these employees were terminated because they were doing essentially the same task as other employees. According to another employee, a supervisor in the cutting department noticed the six sleeper line inspectors leaving the plant. This employee stated that the supervisor left and upon his return warned cutting department employees not to talk about the union where they could be overheard and added that these employees had been terminated because "they were talkin' union."

On Friday, September 16, 1988, Miller returned to the plant to pick up her paycheck and to obtain employee signatures on union authorization cards. At this time, Eric Coler signed a union card. A production manager subsequently took a union card from another employee and told Miller and the others with her that they could not hand out literature in the parking lot because they were no longer employed by Mini-Togs. Miller and the others left. Later that day the production manager told Mini-Togs's president, Ed Hakim, that he had seen the other employee sign a union card; he gave the card to Hakim. It was disputed, however, whether Hakim also learned that Coler had signed a union authorization card. On Monday, September 19, Coler was discharged. Coler, who had been employed by Mini-Togs for about one month, was terminated because he was harassing another employee and calling her a "fat ass" and "fat doughnut." This employee was upset about these comments and complained to Hakim. Hakim asked Coler if he had made these statements, and Coler denied that he had. Hakim told Coler that if he would admit saying these things, no disciplinary

action would be taken against him;  however, if he denied them and an investigation determined that he did say them, he would be terminated.  Coler maintained that he had not made the comments.  A witness was interviewed, and her story matched the other employee's and indicated that Coler had indeed harassed the employee.  When Hakim asked Coler what he had to say about this, he simply shrugged his shoulders.  Hakim stated that he fired Coler for his harassment of the employee and that he considered in his decision the fact that Coler had only been employed for one month.

On October 17, 1988, Hakim made a fiery speech against the union.  During this speech, given during working hours, Hakim made several references to employers who closed their businesses after employees chose union representation;  furthermore, he blamed "unionism" for causing steel mills to close domestic plants and reminded the employees of how scarce employment was in this location. He also reminded them that Mini-Togs had shut down an entire production line in 1983 in response to an attempt by employees to unionize.

During his speech, Hakim also made specific reference to Alice Faye Washington, a leading union adherent.  Washington was a sewing machine operator who, at that time, had never been disciplined during her twelve years of employment with Mini-Togs.  In his speech, Hakim referred to Washington by name and stated that she should remember the shutting down of the production line in 1983 because she was in that line.  He warned employees to be careful when they signed union cards because Washington might be the union representative to whom they would eventually have to answer.  Hakim also told the employees that Washington had served time in prison.

After the speech was concluded, the employees were given forms addressed to the union which stated, "I did not understand what the union card meant when I signed it.  Please cancel my union card and return it to me."  The form suggested that, after signing it, each employee should give a copy to his or her supervisor, who in turn would give a copy to Hakim.  Hakim personally asked Washington to sign the form.  She refused.

On October 20, 1988, Washington, Miller, Gayden, and others distributed pro-union handbills to employees arriving for work.  The handbill included the signatures of Washington, Miller, Gayden, and all other members of the organizing committee.  Gayden's supervisor observed what she was

doing. Approximately one hour later, the supervisor told her to clock out and go home. Gayden testified that she was given no explanation as to why she was laid off. Another employee testified that there was plenty of work to do. According to Mini-Togs, however, the decision to lay off Gayden had been made as early as October 12. Gayden's supervisor announced that two shifts were being combined and eight of the seventeen employees in this department would be laid off according to their production. Gayden was told on October 12 that she was laid off. On this same day, however, Gayden's supervisor told her that she wanted her temporarily to come back to work in the packing department to help with shipment of a special order. Gayden returned and worked October 18 and 19, and was again sent home on October 20. Mini-Togs maintained that Gayden was laid off at this time because the special order was ready to be shipped and she was no longer needed. Gayden returned to work on January 3, 1989.

On Friday, October 28, 1988, Washington read an anti-union flyer that had been left on her sewing machine. She loudly referred to the contents of the flyer as "a bunch of god damn lies" and referred to the distributors of the flyers as "f-----g whores." Washington was overheard by another employee who had recently revoked her union card and who had participated in distributing the anti-union flyers. This employee reported Washington's statements to a supervisor. On Monday, October 31, Hakim called Washington and six other employees to his office. In the office, Mini-Togs's attorney separately questioned each of the employees regarding Washington's conduct on October 28. Washington denied that any such incident had occurred and refused to answer any questions. Washington was told to leave the premises until she decided to answer Hakim's questions.

On November 3, 1988, Hakim sent a letter to Washington stating that she was on indefinite suspension for use of language that was profane, cursing, and defamatory in the presence of and regarding other employees. Hakim offered to limit the suspension to thirty days if Washington would apologize to the workers at whom she had directed her statements, after which she could return to work on six-months probation. Washington was warned that if she rejected this offer, her indefinite suspension would be converted to a discharge. On November 9, Washington wrote Mini-Togs and rejected the proposal; in this letter she again denied that she had committed any misconduct. Hakim

sent Washington a second letter and gave her an additional three days in which to respond. When she failed to reply, she was terminated.

## II

Based upon these facts, the Board concluded that Mini-Togs had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by (1) threatening employees with discharge, layoff, or plant closure if they selected a union as their collective-bargaining representative; (2) informing employees that other employees were discharged because of their union activities; (3) imposing an overly broad no-solicitation rule applicable only to union solicitation; (4) interrogating employees regarding their union activities; and (5) soliciting employees to withdraw their signed union authorization cards. The Board further concluded that Mini-Togs had violated sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1), by discriminatorily laying off Gayden and Miller and discharging Coler, Washington, and six other employees for the purpose of discouraging union activities.

The Board issued an order requiring Mini-Togs to cease and desist from unfair labor practices. The order required Mini-Togs to offer reinstatement to the discriminatorily discharged employees and to make whole these employees and the laid-off employees. The Board is now before this court seeking enforcement of its order.

## III

### A

The Board argues that it is entitled to summary enforcement of its uncontested findings that Mini-Togs violated section 8(a)(1) of the Act by numerous coercive acts, and its findings that Mini-Togs violated sections 8(a)(3) and (1) of the Act by discriminatorily discharging the six sleeper line inspectors. The Board also argues that substantial evidence supports its findings that Mini-Togs violated sections 8(a)(3) and (1) of the Act by discriminatorily laying off Miller and Gayden and by discriminatorily discharging Coler and Washington in retaliation for their union activities.

### B

Mini-Togs only challenges enforcement of the Board's decision pertaining to Miller, Gayden,

Coler, and Washington. Mini-Togs argues that the Board erred in rejecting its defense of Washington's discharge and that Washington's comments were not protected elements of the *res gestae;* therefore, Mini-Togs argues that the Board abused its discretion in ordering the reinstatement of Washington. Mini-Togs also argues that the Board's inference of knowledge of the protected union activities of Miller, Coler, and Gayden is not supported by substantial evidence. Mini-Togs argues that the record does not offer substantial evidence that it knew of and was motivated by protected activities when Miller was laid off and Coler was discharged. Finally, Mini-Togs also argues that the Board's conclusion that Mini-Togs would not have laid off Gayden absent discrimination is not supported by substantial evidence.

## IV

### A

In reviewing the Board's factual findings, this court must determine whether, reviewing the record as a whole, those findings are supported by substantial evidence. 29 U.S.C. § 160(e). We must look to the entire record and take into account whatever in the record fairly detracts from the Board's finding. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). We are not, however, left to sheer acceptance of the Board's conclusions. *Johns-Manville Products Corp. v. NLRB,* 557 F.2d 1126, 1132-33 (5th Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). In reviewing the Board's factual findings, we enforce the Board's order if, after a full review of the record, we are able conscientiously to conclude that the evidence supporting the Board's determination is substantial. *NLRB v. Brookshire Grocery Co.,* 837 F.2d 1336, 1340 (5th Cir.1988). Suspicion, conjecture, and theoretical speculation register no weight on the substantial evidence scale. *TRW, Inc. v. NLRB,* 654 F.2d 307, 312 (5th Cir.1981). The Board and its ALJ are due deference when a finding of fact rests on resolution of witness credibility. *OMNI Int'l Hotels, Inc. v. NLRB,* 606 F.2d 570, 573 (5th Cir.1979). If, however, the credibility choice is based on an inadequate reason, or no reason at all, we are not compelled to respect it. *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 843 (5th Cir.1978).

Motive is a factual matter to be determined by the Board, and the Board reasonably may infer

motive from the circumstances surrounding the employer's actions, as well as from direct evidence. *Marathon-LeTourneau Co., Longview Div. v. NLRB,* 699 F.2d 248, 253 (5th Cir.1983). Where it is shown that opposition to union activity was a motivating factor, the employer will be found to have violated the Act unless the employer demonstrates, as an affirmative defense, that it would have taken the same actions even in the absence of the protected conduct. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401-03, 103 S.Ct. 2469, 2474-75, 76 L.Ed.2d 667 (1983). Reasonable inferences or conclusions drawn by the Board from the facts must be upheld, even though this court would justifiably make a different choice were the matter before us de novo. *Universal Camera,* 340 U.S. at 477, 71 S.Ct. at 459. Our task is to determine whether substantial evidence on the record as a whole supports the Board's findings that the employer violated sections of the Act. *NLRB v. Brookwood Furniture, Div. of U.S. Ind.,* 701 F.2d 452, 464 (5th Cir.1983).

B

The Board found that Mini-Togs violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3). Sections 8(a)(1) and (3), respectively, provide that it is an unfair labor practice "to interfere with, restrain, or coerce employees" in the exercise of their rights to form, join, or assist labor organizations or by discrimination in hiring or tenure or any term or condition of employment "to encourage or discourage membership in any labor organization." *Texas World Service Co., Inc. v. NLRB,* 928 F.2d 1426, 1434 (5th Cir.1991). The General Counsel makes a prima facie showing of a section 8(a)(3) violation by demonstrating that anti-union animus was a motivating factor in an employer's decision to terminate or lay-off an employee. *Id.* at 1435. At this time, the burden shifts to the employer to establish that it would have taken the same action even in the absence of the employee's protected activity. *Id.* If the employer denies that anti-union animus motivated its decision, the Board may rely on circumstantial evidence in determining the employer's actual motive. *NLRB v. Delta Gas,* 840 F.2d 309, 313 (5th Cir.1988).

V

A

We first examine the evidence pertaining to the discharge of Alice Faye Washington. The

Board affirmed the decision of the ALJ in finding that Mini-Togs seized on Washington's use of obscene language as a pretext for ridding itself of an outspoken union advocate, which violated sections 8(a)(3) and (1) of the Act. The Board also affirmed the ALJ's decision that even if Mini-Togs discharged Washington for her use of obscene language, the discharge would be unlawful under section 8(a)(1) because her utterances were part of the *res gestae* of concerted protected activity. For the reasons set forth below, we find that substantial evidence does not support the decision of the Board.

Mini-Togs does not—as well it could not—deny knowledge of Washington's union activities. Instead, it is the contention of Mini-Togs that Washington was discharged solely for directing profane and defamatory language at other employees. The Board rejected this argument. It concluded that Washington was the first employee disciplined for the use of profane or offensive language directed at others when that language was not either directed at a supervisor or accompanied by actual or threatened physical misconduct. The Board further concluded that Washington's remarks were not in any sense a first step toward violence, nor did they involve physical misconduct, veiled threats, or insubordination. We disagree with the Board's findings.

During his testimony, Hakim recounted eight separate instances where employees were disciplined for abusive and profane language.[1] Of these, three involved altercations between fellow employees and, of these three, two did not involve physical violence. Hakim first discussed an instance where a sewing machine operator called another operator a "whore." Both were disciplined and sent back to work, but one of the operators subsequently stabbed the other one and both had to be arrested. Hakim also related an instance where one employee called another employee a "bitch" and told her to move her ass; Hakim called the two employees into his office and told the first employee to apologize for her statements. After the employee apologized, both employees were allowed to return to work. A third similar event related by Hakim involved an employee telling

---

[1]Mini-Togs provided each employee with a rule book, and the rules were also posted. A written rule was that employees were prohibited from use of "provocative statements"; at the bottom of the list of rules was a statement that the breaking of a rule may warrant immediate termination.

another employee to move her ass. Again, the employee was told to apologize to the other employee for her remarks; after she did, both were allowed to return to work. From these events, it is clear that Washington was not the first employee to be disciplined for remarks made to a fellow employee.

Furthermore, Hakim treated Washington no differently from the way that he had treated other employees in similar situations.[2] Hakim learned of Washington's outburst after another employee complained to her supervisor. This employee was so upset by Washington's comments that she had to leave the work area; furthermore, she stated that she felt Washington was directing the comments at her, and that Washington had defamed her character. Hakim also stated that two employees threatened to quit because of the names Washington had called them. Based upon this information, Hakim called Washington into his office to question her about her statements. Washington denied that she had made the alleged comments and refused to answer any questions. Hakim then told Washington to leave until she was ready to answer his questions.

This procedure appears no different from the procedure Hakim had followed in the previous three incidents he described. After the employees admitted making the statement, Hakim instructed them to apologize and then they were allowed to return to work. This process is the same course of action Hakim followed in Washington's case. Washington, however, refused to apologize or further cooperate in the investigation. Accordingly, she was sent home. Soon after, however, Hakim wrote her a letter and told her that if she would apologize to the ladies at whom she directed her comments, she could return to work and be placed on six-months probation. Washington, however, refused the offer. Hakim then extended the time period in which he gave Washington to apologize; he wrote her a second letter and again told her that if she apologized to her coworkers she could return to work. When Washington did not respond to this letter, she was terminated.

Based on these facts, the Board concluded that Mini-Togs's proffered reason for terminating Washington was a mere pretext. We find that this conclusion is not supported by substantial evidence. Hakim treated Washington no differently from other employees in the same situation. Hakim gave Washington at least two opportunities to return to work. His condition that she

---

[2]In fact, from the record it appears he may have actually treated Washington more leniently.

apologize to her coworkers was not a sham invented for anti-union reasons: this procedure had been the same one that he had followed in the past. Moreover, the requirement for apologies was not an unreasonable policy to follow in order to maintain discipline and some degree of mutual respect for each other among employees. We hold that Mini-Togs terminated Washington for a legitimate reason and not for her protected union activities. In the vernacular of the workplace, "she fired herself" when she refused Hakim's reasonable conditions for continued employment.

In a different twist, the Board further concluded that Washington's conduct was part of her protected concerted activity and that her conduct did not warrant discipline because her use of obscenities and profanity in expressing her disapproval of anti-union employee activities was not so flagrant or egregious as to cost her the Act's protection. Again, we disagree. In *Reef Industries, Inc. v. NLRB,* 952 F.2d 830 (5th Cir.1991), we discussed section 7 of the Act, which guarantees employees the right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. We stated that the threshold question is whether an employee's activity is "concerted," which means the activity is engaged in with, or on behalf of, or on the authority of other employees, and not solely by and on behalf of the employee himself. *Id.* at 835; *see also Prill v. NLRB,* 835 F.2d 1481, 1484 (D.C.Cir.1987), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988) ("concerted activity" encompasses only "those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management"). Certainly Washington's behavior does not meet our test. Her conduct was not engaged in with other employees nor was it on the authority of other employees; instead, she made her comments for her own reasons and solely as an expression on her own behalf. Washington simply lost her temper and shouted obscenities toward other employees; this outburst is not protected speech under the Act.

We thus conclude that substantial evidence does not support the decision of the Board that Washington was terminated in violation of sections 8(a)(3) and (1) of the Act. We therefore decline to enforce the Board's order as it pertains to Washington.

B

We now turn to the evidence regarding the lay-off of Karen Miller. In adopting the findings of the ALJ, the Board concluded that Mini-Togs was aware of Miller's union activities and that her lay-off was in reprisal for her union activity. The Board based its finding of knowledge by Mini-Togs on a conversation that allegedly took place on the day Miller was laid off. This conversation supposedly involved a supervisor and two employees. One of these employees, George Henry Ponsell, testified that the supervisor, George Standifer, was talking with him and another employee, Ed Knighten, when they noticed several employees leaving the workplace. According to Ponsell, Standifer left to find out what was going on and when he returned he warned them that these employees were being laid off because they were "talkin' union." Both Standifer and Knighten, however, testified that this conversation never took place. Standifer stated that he saw employees leaving that day, but he was unaware of any layoffs. Similarly, Knighten testified that he was not involved in a conversation with Standifer and that he heard nothing about layoffs.

The record shows that Ponsell was in a bitter domestic dispute with his wife. He was angry with management because he wanted them to lay off his wife, which management refused to do. Ponsell had twice been disciplined by management for harassing his wife at work. Furthermore, Ponsell's testimony was directly contradicted by the testimony of both Standifer and Knighten.[3] It is therefore questionable whether this conversation ever occurred and, if it did, what was actually said. Even if this conversation actually took place, the three men witnessed the departure of the six sleeper line inspectors; Miller had been laid off earlier in the day. The connection between this alleged conversation and the lay-off of Miller is too tenuous to serve as the basis for the Board's conclusion that Mini-Togs had knowledge of Miller's union activities. If the Board's ultimate factual conclusions rest on inferences from the evidence, we cannot uphold the findings if these inferences are implausible. *NLRB v. Ryder/P.I.E. Nationwide, Inc.,* 810 F.2d 502, 508 (5th Cir.1987). We find that substantial evidence does not support the Board's conclusion that Mini-Togs had knowledge of Miller's union activities. The General Counsel therefore failed to make out a prima facie case showing

[3]The ALJ, however, questioned Standifer's reliability as a witness and discredited Knighten's testimony.

that Miller's union activity was a motivating factor in her lay-off. Accordingly, we decline to enforce the Board's order as it pertains to Miller.

## C

We now turn to the evidence concerning the lay-off of Patricia Gayden. Gayden was originally laid off on October 13 with seven other pressers. Gayden, however, was told to return to work on October 17 to help pack a large order. Gayden worked on October 18 and 19. When Gayden arrived for work on October 20, she distributed pro-union handbills in the parking lot. After she entered the building, she saw supervisors with copies of the handbill, and she testified that she saw them looking at her. Approximately two hours later, Gayden was told to clock out and go home. Based upon these facts, the Board concluded that Mini-Togs had knowledge of Gayden's union activities.

Mini-Togs's proffered reason for laying off Gayden was lack of work. Although it may be true that work involving the special packing assignment given to Gayden was completed, there was testimony that there was plenty of other work to be done. Indeed, based on the fact that they did not tell her in advance that October 20 would be her last day, it appears that Mini-Togs had decided to find additional work for Gayden until she was seen distributing union handbills. Because there was additional work to be completed that could have been assigned to Gayden, we conclude that the Board's finding that lack of work was a pretextual reason and that Gayden was laid off in violation of sections 8(a)(3) and (1) of the Act is supported by substantial evidence. We therefore affirm the findings of the Board concerning the lay-off of Gayden.[4]

## D

We now turn to the evidence concerning Eric Coler. Coler signed a union authorization card on Friday, September 16, 1988; on Monday, September 19, Coler was discharged. The Board concluded that Mini-Togs had knowledge of Coler's union activity based on a conversation that took place between a supervisor and Hakim. The supervisor had, without question, witnessed another

---

[4]We do not, however, comment on the extent of the damages to Gayden. Mini-Togs may, or may not, be able to demonstrate that Gayden could have worked only a limited number of days, in which case she would not be entitled to damages for the full amount of time she was laid off.

employee signing a union card, and at least one employee testified that the supervisor also saw Coler sign a union card. This supervisor admitted taking the card from the other employee and giving it to Hakim. From this information, the Board inferred that the supervisor also told Hakim that Coler had signed a union card. We find this inference to be reasonable.

Mini-Togs argues that Coler was terminated because of comments he made to a fellow employee and that his union activities had no thing to do with the decision. An employee had complained to Hakim that Coler had called her names, such as "fat ass" and "fat doughnut." Hakim questioned Coler about these events and conducted an investigation. After Coler refused to admit he made the comments, Hakim terminated his employment. Hakim testified that Coler was terminated "because he was—he was—he was like badgering her, not for the—not really for the abusive language. He was harassing her." The Board concluded that, based on the timing of the discharge and Hakim's demonstrated willingness to resort to unfair labor practices, the General Counsel had made out a prima facie case. The Board further concluded that Mini-Togs's proffered explanation was an attempt to disguise the real reason for Coler's discharge. We think that it is rather clear from the record that Coler engaged in the misconduct that his fellow employees charged against him. However, we determine only whether the Board's finding that the termination was for union activity is supported by substantial evidence. After reviewing the record below, we conclude that the findings of the Board concerning the discharge of Coler are supported by substantial evidence. The record in this case supports a view that except for the fierce anti-union sentiment of the company, Coler would have been disciplined in a less harsh manner. Accordingly, we enforce this part of the Board's order.

VI

For the reasons stated, we hold that the Board's findings regarding Washington and Miller are not supported by substantial evidence. As such, we deny enforcement of this part of the Board's order. We further hold, however, that the Board's findings of violations of sections 8(a)(3) and (1) regarding Gayden and Coler are supported by substantial evidence. We therefore grant enforcement of this part of the Board's order.

ENFORCEMENT GRANTED IN PART and DENIED IN PART.