15-2551-cv
*Metro-North Commuter R.R. Co. v. U.S. Dep't of Labor*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2016

(Argued: Thursday, December 1, 2016     Decided: March 23, 2018)

No. 15-2551-cv

_____

METRO-NORTH COMMUTER RAILROAD COMPANY,

*Petitioner,*

-v.-

UNITED STATES DEPARTMENT OF LABOR,

*Respondent,*

ANTHONY SANTIAGO,

*Intervenor.*

_____

Before:     LIVINGSTON, CHIN, and CARNEY, *Circuit Judges.*

Petitioner Metro-North Commuter Railroad Company seeks review of a final order of the United States Department of Labor Administrative Review Board ("ARB"), affirming the decision of an Administrative Law Judge ("ALJ") who concluded that Intervenor Anthony Santiago was entitled to relief under

§ 20109(c)(1) of the Federal Railroad Safety Act, 49 U.S.C. § 20101 *et seq.* The ALJ determined that Metro-North had denied, delayed, or interfered with Santiago's medical treatment for a back injury he suffered during the course of his employment. We conclude that the ALJ's determination was unsupported by substantial evidence. Accordingly, the petition for review is **GRANTED**, the order of the ARB is **VACATED**, and the case is **REMANDED** for further proceedings consistent with this opinion.

FOR PETITIONER:                           BECK S. FINEMAN, Ryan Ryan Deluca LLP, Stamford, CT.

FOR RESPONDENT:                           JESSE ZVI GRAUMAN (M. Patricia Smith, Solicitor of Labor; Jennifer S. Brand, Associate Solicitor; William C. Lesser, Deputy Associate Solicitor; Rachel Goldberg, Acting Counsel for Whistleblower Programs, *on the brief*), United States Department of Labor, Office of the Solicitor, Washington, DC.

FOR INTERVENOR:                           CHARLES C. GOETSCH, Charles Goetsch Law Offices, LLC, New Haven, CT.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Intervenor Anthony Santiago, an employee of Metro-North Commuter Railroad Company ("Metro-North"), hurt his back when he fell from a broken chair in mid-2008. Metro-North's Occupational Health Services ("OHS"), a non-treatment facility operated and staffed by a contractor, Take Care Health Systems ("Take Care Health"), determined that same day that the injury was occupational. Metro-North accordingly undertook to pay 100% of Santiago's reasonable

treatment costs. Approximately three months after the accident, while Santiago's treatment was ongoing, OHS Physician's Assistant John Ella deemed Santiago's occupational injury resolved, relieving Metro-North of its obligation to pay. OHS Medical Director Dr. Lynne Hildebrand confirmed Ella's determination a few weeks later. Santiago contends that, as a result, he had to delay his manipulation under anesthesia ("MUA") treatments — chiropractic procedures recommended by his doctor — for several months while he arranged for an alternative method of payment.

Santiago filed a complaint with the United States Department of Labor's Occupational Safety and Health Administration ("OSHA"). He alleged, as relevant here, that Metro-North denied, delayed, or interfered with his medical treatment in violation of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109(c)(1). A Department of Labor Administrative Law Judge ("ALJ"), on remand from the Department of Labor's Administrative Review Board ("ARB"), ruled in Santiago's favor. The ALJ awarded injunctive relief, compensatory damages, punitive damages, attorneys' fees, and costs. The ARB affirmed.

For the reasons stated below, we conclude that the Department of Labor's determination that Metro-North violated the FRSA was unsupported by

3

substantial evidence.   We therefore GRANT the petition for review, VACATE the decision of the ARB, and REMAND the case for further proceedings consistent with this opinion.

## BACKGROUND

### I.   Factual Background[1]

**A. Metro-North's Occupational Health Services Department ("OHS")**

Metro-North, a public benefit corporation and subsidiary of the Metropolitan Transportation Authority ("MTA") serving the northern and eastern suburbs of New York City, pays its employees' medical bills for treatment of on-the-job, or "occupational," injuries, except where the treatment is "wholly unnecessary or inappropriate," *i.e.*, where it falls outside "the spectrum of appropriate medical treatment."   Joint App'x 648–49.   Private insurance that Metro-North workers obtain through their employment covers non-occupational injuries and other medical needs.

Prior to late 2003, Metro-North's OHS department was responsible for determining whether an employee's injury was occupational.   That October,

---

[1] The factual background presented here is derived from undisputed facts in the record unless otherwise noted.

however, after a competitive bidding process, Metro-North contracted with CHD Meridian Healthcare — now known, after a merger, as Take Care Health — to operate OHS as an "independent medical facility" for this purpose, among others.[2] *Id.* at 439. Take Care Health is an affiliate of Walgreens that provides similar services to a variety of major corporations (General Motors, Johnson & Johnson, Kodak, and Toyota, to name a few), as well as other MTA entities, including the Long Island Rail Road.

OHS Medical Director Hildebrand, an experienced family-medicine and occupational-health practitioner who joined OHS in early September 2008, supervised a team of physician's assistants and physical therapists, all employees of Take Care Health. They, together with other operational staff, reported to an OHS administrator, a registered nurse who was also an employee of Take Care Health. Metro-North itself employed a separate administrator for OHS-related matters, Angela Pitaro, a registered nurse with over thirty years' experience. Her responsibilities included "[m]anaging the terms and conditions" of Metro-North's

---

[2] To be clear, OHS does not provide medical treatment to Metro-North employees. We refer to the organization that operated OHS during the period relevant to this appeal as Take Care Health, as the parties do in their briefs, though it appears that the organization's renaming occurred during the course of Santiago's treatment.

contract with Take Care Health, "[d]eveloping and implementing, procedures, guidelines[,] and goals for [Take Care Health] employees," "[a]cting as a liaison between [Take Care Health] employees and [Metro-North]," and "[d]efining the roles and decision-making parameters of [Take Care Health] employees." *Id.* at 488. Pitaro maintains that she exercised no influence over medical decisions made by OHS staff.

Under its contract with Take Care Health, Metro-North retained significant authority over OHS. It could (1) terminate the contract at any time and for any reason; (2) veto the addition or removal of OHS staff; and (3) direct that any OHS staff member be removed. Metro-North's Vice President of Human Resources, Greg Bradley, oversaw OHS and, together with Pitaro, held staff meetings with the Take Care Health employees who performed the functions of the department. Neither the contract between Metro-North and Take Care Health nor Metro-North's policies, however, tied the compensation or bonuses of Take Care Health staff to medical decisions made by Take Care Health, including, as relevant here, decisions concerning whether an injury was occupational and when an occupational injury had resolved.

6

**B. Santiago's Injury and Treatment**

In 2005, Santiago began working for Metro-North as an electrician. He had a history of back ailments, and underwent successful surgery for a herniated disc in 2003. Metro-North cleared him for full duty before he began working, however, and he had been asymptomatic prior to the incident at issue here.

Early in the morning on Friday, July 25, 2008, Santiago sat down on a broken chair in a Metro-North lunchroom in Brewster, New York. The chair gave way, and he fell to the ground. After returning to work with minimal discomfort, Santiago reported unbearable pain and sought treatment at nearby Putnam Hospital Center. Following an X-ray examination, he was diagnosed with a lumbar strain and sprain, prescribed pain medication, and told to take a two-day break from work.

Santiago was relieved from work that day, and he reported to OHS later that morning. OHS Physician's Assistant Ella — who had worked at OHS since 2006 and as a physician's assistant since 2000 — evaluated Santiago. Recording in his treatment notes for that day that Santiago was in mild distress, Ella determined that Santiago's injury was occupational, triggering Metro-North's responsibility to pay his resulting reasonable medical costs. Metro-North reported the injury to

the Federal Railroad Administration, as required by law. *See* 49 C.F.R. § 225.19(d). The Official Disability Guidelines ("ODG") and the American College of Occupational and Environmental Medicine Guidelines ("ACOEM"), which Ella consulted when assessing employee injuries, indicated that the injury would likely heal within four to six weeks. Metro-North ultimately paid for Santiago's medical treatment for approximately three months.

Santiago maintained a normal work schedule the following week, but he continued to experience pain. He began seeing an orthopedist, Dr. Barry Krosser, a few weeks later in August.[3] Per Dr. Krosser's suggestion, Santiago visited a chiropractor, Dr. Thomas Drag. Based on: (1) a physical examination; (2) Santiago's x-rays, which showed "[s]evere degenerative disc disease . . . with mild spondylosis and adjacent for[a]minal narrowing"; and (3) pain that Santiago described as a "constant deep dull ache" in his lower back that radiated into his buttocks and both legs, Joint App'x 549, 548, Dr. Drag diagnosed a lumbar sprain/strain, together with lumbar/pelvic myofascial fibrosis, lumbar radiculopathy, and bilateral hip fibrosis. He recommended "conservative care"

---

[3] Ella reevaluated Santiago on August 26, 2008, approximately one month after his fall. Santiago informed Ella that he still suffered pain that radiated down his left buttock.

8

for six to eight weeks with three chiropractic visits per week, and he wrote that an MRI and MUA treatments might eventually be warranted. *Id.* at 550. Thereafter, on September 26, Ella approved up to eighteen total visits with Dr. Drag through October 10, 2008, the equivalent of six weeks of the recommended course of treatment.

On October 7, Dr. Drag stated in a letter to OHS that Santiago had experienced only "minimal improvement." *Id.* at 556. He therefore requested approval for an MRI of the lumbar spine, which OHS granted.

Ella evaluated Santiago again on October 10. According to Ella's treatment notes, Santiago was in no distress, reported not taking any medication, and told Ella "that his back [felt] better but [that] he would get the occasional pain on [his] [left] buttock down to [his] leg." *Id.* at 557. Ella accordingly concluded that while Santiago still suffered from an occupational lumbar strain, his chiropractic treatment pre-approval would end that day, pending the results of the MRI.

Later that month, OHS received Santiago's MRI results and a letter from Dr. Drag requesting authorization for six more weeks of chiropractic treatment. The MRI revealed "bulging and discogenic disease and a central subligamentous disc herniation at the L4-L5 level impressing on the thecal sac," as well as "[d]iscogenic

9

disease, bulging[,] and spondylosis at L5-S1." *Id.* at 562. Dr. Drag indicated in his letter that Santiago's treatment would consist of "moist heat, electric stimulation, therapeutic exercises, lumbar decompression and manipulation" three times a week for six weeks. *Id.* at 561.

On or about October 27, 2008, after reviewing Santiago's file, Ella sent a return letter to Dr. Drag informing him that OHS considered Santiago's back injury to be resolved — meaning that the effects of the work-related injury had, in OHS's view, cleared. Ella relied in part on,

- the x-rays from Santiago's July hospital visit, which showed, according to Ella, "severe degeneration of the dis[c] at the spot that [Santiago] ha[d] a problem with, which was expected after [his herniated disc] surgery" and which "together with his weight" had created a condition unrelated to his employment, *id.* at 215;

- Ella's physical examinations of Santiago; and

- the ODG guidelines.

The letter instructed Dr. Drag to send all future charges to Santiago's private insurance provider.

Dr. Drag responded to Ella's letter with a November 10, 2008 "Letter of Medical Necessity." *Id.* at 519. The letter described Santiago's condition and treatment, and noted that Santiago had been asymptomatic before his July 25 fall.

10

Since Santiago showed "no lasting improvement," Dr. Drag recommended that Santiago undergo more aggressive treatment, namely MUA. *Id.* at 520.

Dr. Hildebrand responded by letter on November 14. She wrote that she had separately reviewed Santiago's records at Dr. Drag's request and agreed with Ella's determination that Santiago's occupational injury was resolved. She later said that this determination was "fairly clear-cut" because the "degenerative changes" in Santiago's spine "would not be caused by falling off a chair." *Id.* at 983, 979. But at no point before reaching their conclusions did either Ella or Dr. Hildebrand speak with Santiago's treating physicians — Dr. Krosser and Dr. Drag — even though it was Metro-North's policy to do so. Dr. Hildebrand confirmed her analysis again on November 24 after reviewing Santiago's file.

While Santiago's health insurance covered his continued chiropractic treatment with Dr. Drag — he received nearly fifty treatments after October 10, 2008, which Santiago testified continued without delay — Santiago's insurer declared that it would not cover his MUA treatments. Santiago eventually funded the MUA treatments via a credit card loan, but he maintains that securing funding delayed those treatments approximately six months, from October 2008 until March 2009. Santiago considers the MUA to have been successful.

11

## II.  Procedural History

Santiago filed a complaint with OSHA on December 29, 2008.  He contended, as relevant here, that by virtue of deeming his occupational injury resolved, Metro-North denied, delayed, or interfered with his medical treatment in violation of the FRSA, specifically 49 U.S.C. § 20109(c)(1).  On June 18, 2009, OSHA found that "[a] preponderance of the evidence support[ed] a finding that [Metro-North] interfered with [Santiago's] medical treatment," awarded damages, and ordered a variety of other remedial measures.  Joint App'x 663.  Metro-North objected to OSHA's determination and requested a hearing before an ALJ.[4]

On September 14, 2010, ALJ Colleen A. Geraghty overturned OSHA's determination and dismissed Santiago's complaint.  She began her analysis by noting that Congress, in enacting § 20109, "was concerned with the underreporting of injuries, the effect some railroad policies had on an employee's willingness to report work-related injuries and the effect such employee reluctance has on the accuracy of data the [Federal Railroad Administration] uses in its efforts to improve railroad safety."  *Id.* at 16.  She concluded that § 20109(c)(1) covers

---

[4] Metro-North settled a separate Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, lawsuit brought by Santiago for $25,000 minus sick-day liens, plus an additional $12,000 for outstanding medical bills.

only the temporal period immediately following injury, and that Metro-North did not deny, delay, or interfere with Santiago's treatment during that period.[5]  Even assuming § 20109(c)(1)'s temporal scope were broader, she added, Santiago had not established a violation of the provision because Metro-North was entitled to "declin[e] to pay for medical care," and § 20109(c)(1) imposes no obligation to the contrary.  *Id.* at 24–25 n.36.

Santiago appealed the ALJ's decision to the Department of Labor's Administrative Review Board ("ARB"), which reversed the ALJ's decision in part in July 2012.  The ARB ruled that § 20109(c)(1)'s application is not temporally limited to the immediate aftermath of an on-the-job injury, and it remanded the case for reconsideration of the merits of Santiago's § 20109(c)(1) claim.  The ARB also took issue with what it deemed the ALJ's too-narrow construction of the words "deny, delay, or interfere."  The ARB explained that those words should be "applied as they are commonly understood," namely as "to impede, slow

---

[5] Section 20109(c), on which Santiago relies, is entitled "Prompt Medical Attention."  Subsection (1) provides that "[a] railroad carrier . . . may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment.  If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care."

down, or prevent medical treatment from moving forward or occurring." *Id.* at 43. To show a violation of § 20109(c)(1), an employee need prove only that "(1) the carrier inserted itself into the medical treatment[,] and (2) such act caused a denial, delay, or interference with medical treatment." *Id.* at 44. There was plainly a delay, so the "real question" here, according to the ARB, was "whether physician's assistant Ella's decision to deny Dr. Drag's request to perform an MUA was truly an independent decision or whether Metro-North exerted sufficient influence over OHS and Ella to cause Ella to reject the treating physician's request." *Id.* at 46.

The ARB also explained what each party must show on remand. The Board concluded that the burden-shifting scheme established by the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121, applies to § 20109(c)(1) claims like this one. *See* 49 U.S.C. § 20109(d)(2)(A). The ARB then explained that, in general, that scheme requires an FRSA complainant to establish by a preponderance of the evidence that "(1) he engaged in a protected activity, as statutorily defined; (2) he suffered an unfavorable personnel action; and (3) the protected activity was a contributing factor in the unfavorable personnel action." Joint App'x 34. Once a *prima facie*

14

case is established, the railroad can rebut it by "prov[ing] by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the complainant's protected behavior." *Id.*

The ARB acknowledged that the AIR 21 burden-shifting scheme "must be tailored to work" in the context of § 20109(c) claims because "the language in section 20109(c) does not fit exactly with the AIR 21 burdens of proof." *Id.* at 37, 46. The parties agree that the "protected activity" in § 20109(c)(1) cases is reporting an injury. At the final step of the burden-shifting scheme, an employer may avoid liability by showing that it would have undertaken an adverse action irrespective of the employee's protected activity. But since reporting an injury is a prerequisite to the adverse action at issue (namely, the railroad's alleged interference with the treatment sought), an employer can never show that it would have acted the same regardless of the employee's injury report. To improve the fit, the ARB therefore adapted the test: a railroad employer may rebut an employee's *prima facie* case by proving with clear and convincing evidence "that the result would have been the same with or without the railroad carrier's interference." *Id.* at 46. In Santiago's case, that showing would require

15

establishing that "any reasonable doctor would have made the same decision that Ella made, absent Metro[-]North's alleged interference." *Id.*

On remand, the ALJ found that Metro-North had violated § 20109(c)(1). Addressing whether Metro-North inserted itself into Santiago's medical treatment, the ALJ first explained that, as a general matter, "there was overwhelming evidence that Metro[-]North ha[d] substantial control over the operations of OHS," particularly given Metro-North's ability to terminate its contract with Take Care Health for any reason and its "control over the hiring and termination of OHS personnel." *Id.* at 59. The ALJ also noted that Metro-North funded OHS's budget; that Metro-North's administrator, Pitaro, was present at OHS, had "daily interactions with OHS staff," and thus had "significant influence over the OHS decision[-]making process"; that OHS injury classifications were made "to reduce Metro[-]North's liability for occupational injuries"; and that Ella was aware that as a result of his deeming Santiago's occupational injury resolved, Metro-North would no longer pay for Santiago's treatment. *Id.* Accordingly, the ALJ found that "the extensive control Metro[-]North ha[d] over OHS . . . influence[d] the way OHS employees view[ed] and ma[d]e decisions regarding an employee's injury." *Id.* at 59–60.

Next, the ALJ concluded that the decision-making process underlying the determination that Santiago's occupational injury had resolved was so deficient that it could not have been "truly independent, without any influence." *Id.* at 60. Santiago had no symptoms before July 25, making it "highly unlikely that his ongoing significant pain was due to his pre-existing condition." *Id.* The ALJ noted that Ella and Dr. Hildebrand failed to consider the possibility that Santiago's symptoms stemmed from a herniated disc that could have been caused by a traumatic injury. In addition, Ella and Dr. Hildebrand did not contact Santiago's treating physicians before deeming the injury resolved. Nor did they provide any explanation for "reject[ing]" the MRI results and Dr. Drag's medical opinions. *Id*. The ALJ treated the testimony of Ella and Dr. Hildebrand regarding the independence of OHS's medical determinations "with considerable skepticism" because each was still employed by Take Care Health at the time of the hearing. *Id.* The ALJ accordingly concluded that Metro-North "inserted itself into [Santiago's] medical treatment," with the result that Santiago's MUA treatment was delayed. *Id.* at 61.

Finally, with respect to Metro-North's attempt to rebut Santiago's *prima facie* case, the ALJ found that Metro-North failed to demonstrate that any reasonable

doctor would have concluded that Santiago's occupational injury had resolved. The Take Care clinicians' judgment was inconsistent with "objective diagnostic tests, medical records, ongoing symptoms, and the treating physician's opinion."[6] *Id.* at 62. Metro-North's request to submit additional medical evidence on remand was denied.

The ALJ directed Metro-North to amend its records to reflect Santiago's continued occupational injury. The ALJ then awarded $1,203.60 to Santiago in wages for missed work while he prosecuted his claim; $4,520 in compensatory damages for medical expenses that Santiago paid out of pocket and had not already recovered in other litigation; $40,000 in punitive damages; and $89,048.66 in attorneys' fees and costs.

The ARB affirmed on June 12, 2015. It noted that the ALJ improperly denied Metro-North's request to offer medical expert testimony, but found the denial to be harmless error because any such evidence would not satisfy Metro-North's "clear and convincing" burden of proof under AIR 21. According to the

---

[6] The ALJ likewise found that Metro-North had not established that MUA was outside the spectrum of appropriate medical treatment given Dr. Drag's opinion on the matter and the eventual success of that treatment.

18

ARB, the record clearly demonstrated that the medical determinations of Ella and Dr. Hildebrand were erroneous.

Metro-North timely petitioned this Court for review pursuant to Fed. R. App. P. 15 and 49 U.S.C. § 20109(d)(4). Santiago moved for leave to intervene, and we granted his motion on September 18, 2015. We also granted the parties leave to file supplemental briefing and a supplemental appendix addressing whether the Department of Labor exceeded its subject matter jurisdiction.

## DISCUSSION

The FRSA provides for review of ARB action subject to the dictates of the Administrative Procedure Act ("APA"). *See* 49 U.S.C. § 20109(d)(4). Under the APA, this Court must "set aside agency action, findings, and conclusions" when, as relevant here, they are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E); *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 445–46 (2d Cir. 2013). Substantial evidence is more than a scintilla, but less than a preponderance. *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999). It is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). The mere

"possibility of drawing two inconsistent conclusions from the evidence" does not render an agency's finding unsupported by substantial evidence. *Id.* (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981)).

## I

Before explaining why vacatur is warranted, we briefly address the ARB's interpretation of § 20109(c)(1). This Court has not yet decided whether the ARB's interpretations of the FRSA are entitled to *Chevron* deference. We will not resolve that issue today. We note, however, that there may be reason to question the ARB's approach to § 20109(c)(1).

At the start, § 20109 prohibits covered employers from discharging, demoting, or in any other way discriminating against employees who engage in certain protected activities. Broadly, the substantive provisions of § 20109(a), (b), and (c)(2) bar retaliation against workers who:

- report wrongdoing, §§ 20109(a)(1), (a)(3)–(7), (b)(1)(A);

- refuse to violate federal law, § 20109(a)(2);

- decline to work in unsafe conditions, §§ 20109(b)(1)(B)–(C); or

- request medical assistance or follow medical advice, § 20109(c)(2).

20

Pursuant to § 20109(d), "[a]n employee who alleges discharge, discipline, or other discrimination in violation of subsection (a), (b), or (c)" may file a complaint with the Department of Labor. § 20109(d)(1). Upon establishing a claim, the employee is entitled to compensatory damages, attorneys' fees, costs, and, in the ALJ's discretion, up to $250,000 in punitive damages. § 20109(e)(2)–(3).

Under § 20109(d)(2)(A)(i), retaliation complaints are subject to the "legal burdens of proof set forth in section 42121(b)" — namely, the AIR 21 burden-shifting framework that the ARB elaborated upon in this case. Pursuant to this framework, an employee must first show that his protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." § 42121(b)(2)(B)(i). The burden of persuasion then shifts to the employer, which can raise an affirmative defense. The employer can avoid liability by demonstrating, "by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence" of the protected activity. §§ 42121(b)(2)(B)(ii), (iv).

Section 20109(c)(1), by its terms, does not appear to have been drafted with this overall framework for the treatment of retaliation complaints in mind. At the start, § 20109(c)(1) differs from § 20109's other substantive prohibitions which,

21

as already discussed, forbid employers from punishing employees who engage in protected activity such as whistleblowing. Section 20109(c)(1) instead mandates that railroad employers refrain from interfering with the medical treatment of injured workers and that they transport such workers to a hospital upon request:

> **(1) Prohibition.** -- A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.

§ 20109(c)(1).[7]

As already noted, the substantive prohibitions of § 20109(a), (b), and (c)(2) may be enforced pursuant to subsection (d) by employees who file complaints

---

[7] Section 20109(c)(2), in contrast, *does* parallel § 20109(a) and (b) by prohibiting employers from punishing employees for requesting medical or first aid treatment, or for following a treatment plan:

> **(2) Discipline.** -- A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty.

§ 20109(c)(2).

22

with the Department of Labor "alleg[ing] discharge, discipline, or other discrimination" in violation of the preceding subsections. With regard to § 20109(c)(1), however, it is unclear how an employee could *ever* allege that an employer's failure to call an ambulance or, as here, its refusal to pay for specified chiropractic treatment constituted "discharge, discipline, or other *discrimination*" under (d)(1) (emphasis added). *Cf. Ala. Dep't of Revenue v. CSX Transp., Inc.*, 135 S. Ct. 1136, 1141 (2015) (noting that the "ordinary meaning" of discrimination is the treatment of "groups that are similarly situated differently without sufficient justification for the difference in treatment" (alterations and quotation marks removed) (quoting *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 287 (2011)).

The AIR 21 burden-shifting scheme as applied to § 20109(c)(1) is similarly awkward. For instance, it is not obvious how an employee could satisfy her AIR 21 burden of production when filing a complaint because (c)(1) does not specifically identify a protected activity. The litigants before us have skirted this issue by framing (c)(1)'s "protected activity" as informing the employer that one is injured. If they are right, presumably the "unfavorable personnel action" for AIR 21 purposes is the employer's denial of or interference with medical

treatment.   But when we treat informing the employer that one is injured as a "protected activity" and the denial of medical treatment as the relevant "unfavorable personnel action" under the AIR 21 burden-shifting approach, we are left with nonsense.[8]

Highlighting these problems, Metro-North argues that the Department of Labor has no jurisdiction over § 20109(c)(1) claims — presumably on the theory that it is § 20109(c)(2), and not (c)(1), that sets forth § 20109(c)'s retaliation prohibition.   This argument, if correct, would resolve the interpretive difficulties noted here.   Metro-North never raised this argument below, however, and a challenge to the Department of Labor's subject matter jurisdiction is not a challenge to ours.   *See generally City of Arlington v. FCC*, 569 U.S. 290, 304 (2013) (noting the "false dichotomy" between "jurisdictional" and "nonjurisdictional" agency interpretations).   The issue is therefore waived, and we will not address it.   *See Zatz v. United States*, 149 F.3d 144, 146 (2d Cir. 1998) (per curiam).

---

[8] Consider, for example, a case in which an employer, contrary to § 20109(c)(1), fails to call an ambulance or otherwise to transport an injured employee to the hospital upon that employee's request.   Pursuant to the AIR 21 burden-shifting approach, an employee must first show that *reporting an injury* contributed to the *employer's failure to call the ambulance*.   The burden of persuasion then shifts to the employer, which can avoid liability by demonstrating that it would have *failed to call an ambulance* regardless of *the employee's reporting an injury*.

At the same time, we do not reach the question whether the ARB has properly construed § 20109(c)(1). We conclude, in Section II below, that even assuming *arguendo* that the ARB's interpretation of § 20109(c)(1) is correct, the ALJ's decision is not supported by substantial evidence. As a result, we need not and do not endorse the ARB's interpretation of § 20109(c)(1) to resolve this case.

We do note some concerns regarding the ARB's analysis. The statutory language and overall scheme and context of § 20109 suggest that subsection (c)(1)'s purpose "is to ensure employees receive prompt medical attention if they are injured on the job," while subsection (c)(2), "the antiretaliation provision, . . . effectuates that purpose" by prohibiting employers from disciplining or otherwise retaliating against employees who request medical assistance or follow a treatment plan. *Grand Trunk W. R.R. Co. v. U.S. Dep't of Labor*, 875 F.3d 821, 827 (6th Cir. 2017). The ARB recognized in its decision below that railroad carriers need not affirmatively undertake to pay for work-related injuries, and that nothing in § 20109(c) imposes such an obligation. The ARB affirmed, instead, that § 20109(c) is a whistleblower provision. Joint App'x 40–44.

Given all this — that § 20109(c) is not directed at requiring railroad employers to pay for work-related injuries but is, instead, directed at ensuring that

25

injured employees receive prompt medical attention and that employers not retaliate against employees for seeking such attention — we conclude that the ARB's analysis is incomplete.   Again, the Board affirmed that § 20109(c) is a whistleblower provision.   It does not explain, however, why such a provision is properly construed to, in effect, dictate that railroad carriers "stay completely out of the way of medical treatment" and even medical offices, such as OHS, that they have undertaken to fund.   *Id.* at 44.   Nor does the Board consider whether such carriers might elect in the face of such a legal requirement to limit or even abandon voluntary payment schemes of the sort in use here in order to avoid the potential for attorneys' fees, costs, and punitive damages associated with § 20109(d) suits — in this case, 95% of the ALJ's award.

We suggest that the Board might reexamine and further explicate its reasoning regarding § 20109(c)'s interpretation in the future.   Having so advised, we now turn to the lack of substantial evidence to support the ALJ's decision.

**II**

We assume *arguendo* that the ARB's interpretation of § 20109(c)(1) properly applies — that is, we assume, without deciding, that an employer's denial of a medical claim can constitute interference with the medical treatment of an

26

employee in violation of this provision.   On remand, the ALJ had to "decide (1) whether Metro-North sufficiently inserted itself into Santiago's medical treatment[,] and (2) whether such involvement caused a delay, denial, or interference with his medical treatment."   Joint App'x 45.   We assume, for the sake of our analysis, that there was sufficient evidence to support the ALJ's conclusion that the second prong is satisfied here because OHS's determination that Santiago's occupational injury had resolved was causally related to the delay of his MUA treatments.[9]   We accordingly accept that the "real question," as framed by the ARB, is "whether physician's assistant Ella's decision to deny Dr. Drag's request to perform an MUA was truly an independent decision[,] or whether Metro-North exerted sufficient influence over OHS and Ella to cause Ella to reject the treating physician's request."   *Id.* at 46.

We recognize that the substantial evidence standard is decidedly lenient. It is "very deferential[,] . . . even more so than the 'clearly erroneous' standard." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). Nonetheless, we conclude that the record here, considered as a whole, is

_____

[9] This is not necessarily a clear-cut issue because, had Santiago's private insurance company not separately denied coverage for his MUA treatments, there would have been no meaningful delay.

27

inadequate to support the ALJ's finding that Metro-North exerted so much influence over OHS that the OHS determination was not "truly independent," such that Metro-North can be blamed for the delay in Santiago's medical treatment.   Joint App'x 60.

**A. Indirect Pressure**

The ALJ's conclusion rests not on evidence of any affirmative intrusion into OHS's decision-making process on Metro-North's part, but rather on what the ALJ perceived as indirect pressure stemming from the nature of Metro-North's relationship with OHS.   Specifically, the ALJ found that the mere existence of Metro-North's contractual rights, along with Metro-North's "regular daily interactions with OHS staff, and its implementation of policies and procedures," exerted sufficient coercive force to undermine the independence of OHS's determination that Santiago's occupational injury had resolved.   *Id.*   We disagree.

As far as the contractual elements of perceived pressure are concerned, the ALJ is correct that Metro-North retained a variety of important rights under its agreement with Take Care Health.   It had veto power over the addition — and

28

subtraction — of OHS staff, could direct that OHS staff be removed, and could cancel its contract with OHS at any time, and for any reason.

Yet beyond the mere existence of these contractual rights, there is no evidence in the record to suggest they had any effect on the medical judgments of OHS staff, never mind evidence suggesting that OHS's independence was compromised *in this case*. The record does not indicate that Metro-North ever invoked its contractual powers, particularly to ends relevant here. There is no testimony or documentary evidence demonstrating that Metro-North set any goals (including contract-dependent ones) for occupational injury determinations, that it dangled the threat of contract cancellation or staffing changes to encourage cost-minimization, or that it ever acted to prevent the assignment, or to require the removal, of any OHS staff member. There is likewise no record evidence of OHS staff members feeling any pressure — either as a result of the existence or exercise of Metro-North's contractual rights or more generally — to decide matters in any particular fashion, or to do anything other than exercise independent medical judgment.

When an organization such as Metro-North contracts with a medical entity to perform a service on its behalf, it almost inevitably retains some *potential* to

exercise influence over that entity's operations by virtue of the contractual relationship itself. That potential, however, absent *some* evidence indicating it was employed to accomplish specific ends, does not constitute more than a scintilla of evidence that decisions made by the contractor's medical personnel are not independent. This aspect of the ALJ's conclusion thus consists only of "[s]uspicion, conjecture, and theoretical speculation," all of which "register no weight on the substantial evidence scale." *NLRB v. Local 46, Metallic Lathers Union & Reinforcing Iron Workers of N.Y. & Vicinity of the Int'l Ass'n of Structural & Ornamental Iron Workers*, 149 F.3d 93, 104 (2d Cir. 1998) (quoting *NLRB v. Mini-Togs*, 980 F.2d 1027, 1032 (5th Cir. 1993)).

With respect to Metro-North's day-to-day interactions with OHS staff, most notably those initiated by Pitaro, the ALJ reasoned that because Pitaro was "located at OHS," "ha[d] daily interactions with the OHS staff," and was "in charge of implementing Metro[-]North's policies at OHS," she had "significant influence over the OHS decision[-]making process" in service of Metro-North's aim "to reduce [its] liability for occupational injuries." Joint App'x 59. The ALJ, however, did not detail how this supposed influence had any impact on the medical judgments of OHS staff. Indeed, most of Pitaro's responsibilities were

30

independent of OHS's decision-making process and related to her role as liaison for Metro-North. She delivered evaluation requests, met with staff, and set office goals and guidelines — none, importantly, tying compensation to medical judgments regarding occupational injuries. There is no record evidence that Pitaro ever participated in any medical decisions or exerted any pressure on OHS employees to limit occupational injury determinations.[10] Ella determined, on multiple occasions, that Santiago suffered from an unresolved occupational injury such that Metro-North had to pay for his treatment.[11] We conclude that Metro-North's mere presence at OHS, in the form of Pitaro, does not constitute a substantial reason for concluding that Ella's later determination that Santiago's occupational injury had resolved was a result of Metro-North's influence, and not Ella's own medical judgment.

### B. OHS's Deficient Medical Determination

The ALJ also relied on the supposedly suspect nature of OHS's determination that Santiago's occupational injury had resolved. Questioning

---

[10] Nor is there any evidence that the staff meetings held by Bradley and Pitaro ever encroached on medical judgments.

[11] Indeed, Ella testified that he chose to *extend* the period of Santiago's covered chiropractic treatments because of demonstrated improvement.

this determination, the ALJ concluded that supposed deficiencies in the underlying medical judgment provide an additional basis for concluding that OHS was improperly influenced by Metro-North. Again, we disagree.

Dr. Hildebrand concluded that the determination here was "fairly clear-cut," and it appears to have been consistent with ODG and ACOEM guidelines. Joint App'x 983. The ALJ, however, pointed to four items of evidence suggesting that Ella and Dr. Hildebrand may have erred: (1) Santiago was asymptomatic before the July 2008 incident; (2) Santiago's October 16 MRI revealed a herniated disc, which Dr. Hildebrand admitted can be caused or aggravated by traumatic injury; (3) Santiago had, among other symptoms, pain running down his legs following his injury, consistent with a herniated disc; and (4) neither Ella nor Dr. Hildebrand contacted Santiago's treating physicians — at least one of whom had a different opinion — before making their determination.

We will assume that these items of evidence are sufficient to imply that OHS's determination may have been *incorrect*. Still, there is no basis in the record to attribute any such error to Metro-North's influence. Indeed, there is no evidence that makes such a scenario any more likely than the possibility that Ella

32

and Dr. Hildebrand erred due to incompetence, laziness, or simple mistake.[12]  If anything, the record indicates the opposite: Ella, Dr. Hildebrand, and Pitaro all testified that the determination that Santiago's occupational injury had resolved was made independently, and the fact that Ella and Dr. Hildebrand failed to contact Dr. Drag or Dr. Krosser beforehand is consistent with this testimony given that they acted *contrary to* Metro-North policy.

Granted, it was within the purview of the ALJ to question the credibility of Ella and Dr. Hildebrand, who were still employed by Take Care Health at the time of the hearing.  *See, e.g.*, *Moore v. Ross*, 687 F.2d 604, 609 (2d Cir. 1982) ("Federal reviewing courts [] give special weight to ALJs' credibility findings.").  Yet

---

[12] The only additional evidence in support of the ALJ's determination is an analysis performed by a Department of Labor regional investigator, Teri Wigger, concerning injuries OHS reclassified from occupational to non-occupational in other cases.  Wigger examined ten cases and found that in only one of them did the OHS doctor consult with the treating physician prior to reclassification.  Further, in eight cases, symptoms persisted after reclassification.

It is telling that neither the ALJ nor the ARB cited Wigger's analysis as supportive of their conclusions, as its relevance to the question of whether Metro-North unduly influenced OHS in Santiago's case is unclear.  Notably, most of the cases Wigger analyzed involved actual changes in classification, rather than a determination that an occupational injury had *resolved*.  Wigger did not describe how often OHS reclassifies injuries or finds them resolved, nor did she hazard a guess as to whether those reclassifications were incorrect.  (The mere continuation of symptoms does not equate to an erroneous determination.)  In short, Wigger's analysis does not make it any more or less likely that OHS's determination in this case was independent.

credibility findings cannot come out of thin air, and here there is no evidence to contradict these medical professionals' consistent claims of independence, nor any reason to believe that their employment — the only reason the ALJ provided for her skepticism — was sufficient reason for them both to adopt a uniform, yet untruthful, position. *Cf. Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201. 218 (2d Cir. 2015) (concluding, in analogous context, that any potential conflict of interest from both evaluating and paying claims should receive "no weight"). In any event, putting such testimony aside, it is the *lack* of evidence in the record that undermines the ALJ's determination.

\*    \*    \*

Certainly, to meet the substantial evidence standard, an agency need not find a smoking gun. Circumstantial evidence can be sufficient, particularly in light of the deferential standard of review. Here, however, the ALJ (and, by extension, the ARB) speculated, without basis in the record, that the mere existence of Metro-North's contractual rights and the physical presence of a Metro-North administrator at OHS were enough to overwhelm the independence of judgments made by experienced medical professionals. Conclusions must be supported by evidence, however, and here there is none. *Cf. NLRB v. Charles Batchelder Co., Inc.*,

646 F.2d 33, 41 (2d Cir. 1981) (finding the National Labor Relations Board's conclusion unsupported by substantial evidence where it "used speculation" to conclude that an employee quit because of the employer's anti-union animus where the record "indicate[d] only a weak showing of . . . animus," and noting that "union membership alone does not measure up to substantial evidence"). We therefore conclude that, assuming *arguendo* that the ARB's interpretation of § 20109(c)(1) applies, the Department of Labor's decision here was unsupported by substantial evidence.

## CONCLUSION

For the foregoing reasons, we GRANT the petition for review, VACATE the decision of the ARB, and REMAND the case for further proceedings consistent with this opinion.